Francis J. PROPER
v.
The UNITED STATES.
No. 203-54.

United States Court of Claims.
July 12, 1957.

Guy Emery, Washington, D. C., for plaintiff. Ansell & Ansell, Washington, D. C., were on the briefs.

John R. Franklin, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

Plaintiff sues to recover disability retired pay from May 1, 1948, on the ground that the Secretary of the Army acted arbitrarily, capriciously and unlawfully when, on November 28, 1955, on the basis of the recommendation of a military officer of the Army, and contrary to the recommendation of the civilian board for the Correction of Military Records, he denied plaintiff's application for correction of his military record.

On the basis of the pleadings and documents submitted by the parties, plaintiff

and defendant have filed cross motions for summary judgment.

■ Defendant's motion for summary judgment dismissing the petition is based on two grounds: (1) that the claim, if any, accrued on April 27, 1948, the date on which plaintiff was released to inactive duty, not by reason of physical disability, and is therefore barred by the six-year statute of limitations under a petition filed on May 28, 1954; and (2) that in any event plaintiff has failed to state a claim on which relief can be granted because the Secretary of the Army was not required to act through civilian boards or employees in granting or denying plaintiff a correction of his military record.

On the matter of the statute of limitations, defendant urges that proceedings before a Correction Board will not necessarily toll the running of the statute of limitations nor will an alleged arbitrary decision by such Board give rise to a fresh cause of action since resort to that Board is permissive and not mandatory. In the instant case, because of the peculiar facts and circumstances which will be discussed later herein, Correction Board proceedings were the only ones open to this plaintiff, and the only administrative action ever taken on his claim for disability retirement with pay was in connection with his application to that Board. Furthermore, plaintiff's cause of action is *not* based on the alleged arbitrary action of the Correction Board but rather on the alleged arbitrary action of the Secretary of the Army in 1955, acting not through the Correction Board but independently and in fact contrary to the findings, conclusions and recommendations of such Board. As we said in our recent decision in the case of Furlong v. United States, 152 F.Supp. 238 this court acquired jurisdiction of a claim for disability retired pay

"* * * after the * * * Secretary * * * acted, or failed or refused to act * * * arbitrarily or capriciously or contrary to law; * * *."

Accordingly, we hold that plaintiff's claim based on the alleged arbitrary action of the Secretary of the Army is not barred by the statute of limitations.[1]

The facts, which are unusual, are not in dispute. Plaintiff, a former commissioned officer of the Army of the United States and the Officers' Reserve Corps, contracted multiple sclerosis while serving on extended active duty between 1936 and 1948. The first symptoms of this disease were manifested in 1938 during plaintiff's enlisted service in the Regular Army while serving at Fort Missoula, Montana, at which time he began to experience periods of double vision which ultimately required his giving up his favorite Army sport of baseball at which he was very expert.[2] Plaintiff reported to the station hospital where the difficulty with his vision was found to be incorrectible with glasses. Later, there was a spontaneous remission of the double vision, but there were mild periodic recurrences thereafter. At about the same time, plaintiff began to experience an uncontrollable tremor of the head when he became excited. He also began to experience difficulty in using his hands when attempting to write. From 1938 plaintiff has never been completely free for any considerable length of time from the above symptoms.

---

1. The writer of this opinion is also of the view that the petition is timely because this claim for disability retired pay first accrued on the date on which the first payment of such pay would have been paid this plaintiff had he been awarded disability retirement upon his release from active duty on April 27, 1948. If plaintiff had been retired, he would have been retired on May 1, 1948, under the Uniform Retirement Date Act of April 23, 1930, 46 Stat. 253, 5 U.S.C.A. § 47a, with the first installment of pay falling due on May 31, 1948, which date is within six years of the date on which the petition herein was filed.

2. Plaintiff's first full season batting average was .335. It was while serving in Alaska in 1940 that plaintiff was forced to discontinue the sport of baseball because of intensified periods of double vision.

Although plaintiff consulted Army medical officers concerning his symptoms, his disease was not recognized and, on September 21, 1942, during a period of remission of all symptoms, he was commissioned a second lieutenant, Infantry, AUS. In November 1942, plaintiff went to the China-Burma-India Theatre where he remained until February 1945, having by that time achieved the rank of captain. During the period from 1940 through 1945, plaintiff experienced periodic recurrences of double vision and tremors of hands and head. The Army medical officers did not recognize the disease, and since the symptoms did not increase in frequency or intensity during this period, plaintiff was able to perform his military duties in an outstanding manner. The period 1942–1945 covered plaintiff's combat service overseas and his attitude toward his symptoms is best explained in his own words:

"* * * At this time, I did not know the source of the trouble. I wished to retain my commission and I did not want to be returned to the United States as a casualty. The normal, daily events of the service in which I participated, notably the Myitkyina campaign with the Marauders, were such as to minimize minor troubles like double vision and tremors. At times, we all had tremors. In the light of my later experience, however, I feel that the excessive humidity of the jungle climate may have helped to hold my infirmities in restraint for a time."

Immediately upon his return to the United States in February 1945, plaintiff had a violent attack of hand tremors. Upon his release to inactive duty the following December 1945, plaintiff described his symptoms to the medical officers, but no diagnosis was reached and plaintiff was released, not by reason of physical disability.

After plaintiff's release from active duty he was employed by the Chevrolet Division of General Motors where in 1946 he suffered an attack of double vision and blurring of vision which was more intense and prolonged than any previous attack. The Company doctor referred plaintiff to a Veterans' Administration eye specialist and, after extensive examination, plaintiff was told that his vision was 20/200 and was incorrectible with glasses. Later, this attack subsided and plaintiff's vision returned to normal. He was recalled to active duty on October 15, 1946, and was accepted for extended active duty.

During plaintiff's second tour of active duty he began experiencing further symptoms consisting of periods of becoming emotionally upset over minor matters which theretofore had never upset him, periods of lack of control of elimination of kidneys and bowels, periods of pronounced sexual impotency. Although plaintiff sought the advice of civilian and military doctors, no diagnosis was reached and, on April 27, 1948, plaintiff was again released to inactive duty, not by reason of physical disability. Shortly thereafter, plaintiff began to experience numbness in his legs after exercise, and soon he lost all feeling in his legs from the hips down. Plaintiff's double vision then became permanent, and by 1953 plaintiff was no longer able to work. By that time plaintiff could walk only with his feet wide apart and with a bad stagger. It was impossible for him to walk on an uneven surface. He had lost all depth perception and could not focus his eyes even for the brief period required to insert a key in a lock.

In June 1953, a private specialist in neurology made an examination of plaintiff and diagnosed plaintiff's disease as multiple sclerosis. On October 14, 1953, the Veterans' Administration rated plaintiff 100 percent disabled by reason of multiple sclerosis.

On May 28, 1954, plaintiff filed his original petition in this court indicating in paragraph VII thereof that he intended to present an application to the Army Board for Correction of Military Records for correction of his record in accordance with the facts and circumstances set forth in the petition. Following favorable action by the Correc-

tion Board and its later reversal by the Secretary of the Army, plaintiff, by leave of court, amended his petition on September 8, 1955.

Upon the basis of plaintiff's application for correction, and the supporting documents, the Army Board for the Correction of Military Records accorded plaintiff a hearing on June 15, 1955, before five members. The evidence considered by the Board consisted of the plaintiff's application and brief, to which were attached affidavits of three Army officers, two on active duty and one retired, concerning their knowledge of plaintiff's symptoms from 1938–1942; the affidavit of a general medical practitioner who had treated plaintiff from 1947 through 1951, describing his symptoms of nervousness and generalized weakness in 1947 and 1948, and his numbness of legs and double vision in 1949; the affidavit of Dr. L. E. Daniels, specialist in neurology, who examined plaintiff in the summer of 1953 and diagnosed his disease as multiple sclerosis, which disease he characterized as a progressive and incurable disease of the central nervous system; a letter dated November 9, 1953, to plaintiff from the Veterans' Administration notifying plaintiff that an award had been made to him for 100% disability resulting from multiple sclerosis incurred in service; the affidavit dated June 22, 1954, of Dr. Paul Chodoff, specialist in neurology and psychiatry, Washington, D. C., in which he summarized the personal and medical history of plaintiff, including the final hospital summary of the neurological examination made by the Denver Veterans' Administration Hospital in August 1953, and stated that on the basis of that history he was of the opinion that plaintiff was suffering from multiple sclerosis, incurred sometime in 1938; Dr. Chodoff also stated that plaintiff's history, with the remissions and exacerbations of neurological disorder, the evidence of lesions at various locations in the central nervous system, and the tendency for the attacks to become more severely incapacitating and the recoveries less complete, was quite typical

of that disease; that it conformed to sound medical practice to find that the disease is typically characterized by periods, sometimes quite prolonged, of remission after its first onset, as in the case of plaintiff; that multiple sclerosis is usually progressive and that there is no known cure for it at the present time; an affidavit dated August 4, 1954, of Dr. Hilbert S. Sabin, specialist in urology, Washington, D. C., stating that on the basis of the personal and medical history of plaintiff, he was of the opinion that plaintiff contracted multiple sclerosis in 1938; that the symptoms of the disease are more varied than those of any other single organic disease of the central nervous system; and that the disease is progressive and incurable.

The Correction Board also considered a case summary prepared by Examiner Harry M. Shooman, the transcript of testimony given before the full Board, and plaintiff's AG 201 file and his medical records.

In paragraph 14 of the case summary of the Correction Board examiner, reference was made to a memorandum to the Correction Board from the Surgeon General, dated December 16, 1954. The memorandum concerned plaintiff's application for a correction of his record to show that he was totally disabled at the time of his relief from active duty by reason of multiple sclerosis contracted while serving on active duty. The Correction Board Examiner set forth part of the memorandum of the Surgeon General as follows:

"* * * that the records indicate that applicant successfully served his tours of military service, being separated for reasons other than physical disability, 29 Dec. 1945, and on another tour of duty 27 Apr. 1948. He was appointed Capt, ORC, AUS, 18 Oct. 1952, and discharged 1 April 1953 by reason of expiration of Res appointment. By Jul. 1953 symptoms had developed to such a degree as to warrant the diagnosis of multiple sclerosis on a basis of sufficient soundness to ex-

clude reasonable doubt. The records indicate that symptoms compatible with the disease developed as early as 1938, while in the service. Additional symptoms were not of sufficient severity to preclude his performance of military duty and the disease passed unrecognized. The record does substantiate that he was not, in fact, rendered unfit for military service during his service or at the time of his separation. *However, regulations list multiple sclerosis as a disease, the presence of which may render an individual unfit for military service. It is believed that if the presence of the disease had been known in this case at the time of appl's separation, 1945 or 1948, he probably would have been separated from the service by reason of physical disability under the laws, rules, regulations and policies then in effect as being totally disabled."*
[Italics supplied.]

The above excerpt from the report of the examiner for the Correction Board appears to be a direct quotation from the memorandum of the Surgeon General and does not represent the opinion of the examiner who was undertaking merely to make a summary of the documentary evidence for the use of the Board, and was expressing no opinions of his own.

At the hearing before the Correction Board plaintiff testified concerning his personal and medical history and concerning his symptoms. Dr. Chodoff, the specialist in neurology and psychiatry whose affidavit was before the Board as part of the application, also testified. Among his qualifications, Dr. Chodoff testified that he was the consultant in neurology for Walter Reed Army Hospital, the Veterans' Administration, Mount Alto Veterans' Hospital, an associate in neurology at Georgetown Hospital Medical School, codirector of the Multiple Sclerosis Center at George Washington University Hospital, and examiner for the American Board of Neurology and Psychiatry. Dr. Chodoff's affidavit had been made on the basis of plaintiff's personal and medical history. Just prior to the hearing, Dr. Chodoff examined plaintiff personally at George Washington University Hospital where laboratory studies were performed in connection with his examination. Dr. Chodoff found plaintiff to be suffering from multiple sclerosis in an advanced stage. In answer to the question as to what in his opinion was plaintiff's physical condition on December 29, 1945, Dr. Chodoff answered that in his opinion plaintiff had contracted the disease in 1938 and had suffered from the disease continuously from that time; that plaintiff was disabled in 1945 by reason of having this disease which is one "which can break out at any moment or any time." In answer to another question, Dr. Chodoff testified that in his opinion a neurological examination in 1945, prior to plaintiff's first release to inactive duty, would have resulted in a diagnosis of multiple sclerosis and that at the very least, the presence of the disease would have been strongly suspected at that time from plaintiff's history of symptoms. Dr. Chodoff testified that there was nearly as much known about multiple sclerosis in 1945 as in 1955 and that the correct diagnosis could have been made quite well at that time. Asked to account for the fact that no Army or Veterans' Administration physical examination had revealed the presence of this disease by as late as January 1953, Dr. Chodoff stated that no neurological examination was conducted on the plaintiff by either the Army or the Veterans' Administration until the fall of 1953, and that plaintiff's symptoms must have been so quiescent at the times of the prior examinations that the doctors simply did not suspect its presence. Until some time early in 1953, plaintiff was still having occasional periods of remission of symptoms.

Dr. Albert E. Marland, a specialist in nervous and mental diseases also testified before the Board. Dr. Marland had been an examiner and neuropsychiatrist for the Public Health Service, Chief of the 4th District of the Public Health Service,

later transferred to the Veterans' Administration and was in charge of veterans at St. Elizabeths Hospital. Since 1938 Dr. Marland had been a member of the Commission on Mental Health for the District of Columbia and a consultant in psychiatry to the Department of Corrections for the District of Columbia. During this time Dr. Marland had carried on a private practice in his specialty and taught psychopathology at Georgetown University Medical School. Dr. Marland had examined plaintiff personally. He testified that he was of the opinion that as of December 29, 1945, when plaintiff was first released to inactive duty, he was nearly 100% disabled despite the fact that he was performing his military duties in an outstanding manner and continued to do so upon his recall to active duty. Dr. Marland gave the following reasons for this opinion:

"He is afflicted with a disease which like epilepsy, is not always manifested, especially in the early days. You have what are termed remissions, but are never complete. At that particular time [December 29, 1945] he had been afflicted with eye disturbances interfering with his reading. He was unable to read more than short periods of time. He had periods of dizziness, became uncertain driving a car, he was unable to judge the distance of things coming toward him, such as a baseball or things moving slower than that. He was having some disturbance with gait. He had difficulty in writing with a tremor which was manifested at the beginning and also an inability to continue for a long period of time. Had some disturbance of gait, but not much. As I say, these things were not always manifest any more than an epileptic condition or a malignancy is manifest continuously. In estimating his disabilities, it is well to take into consideration the fact that he was a professional soldier and I understand that it can be shown that he was a good soldier which indicates

that he had the ability to take punishment and to continue his work despite that. He is not of the gold bricker type, of which I have seen a lot. He minimized rather than accentuated his troubles. He subsequently had increasing difficulty but as a professional soldier which I say requires stability, I think that his disability was approaching 100% at that time."

Dr. Marland testfied that multiple sclerosis is sometimes difficult to diagnose in its early stages because the various symptoms taken separately, and some together, are compatible with other diseases or complaints. From his knowledge of the disease and of the requirements of military service, the witness was of the opinion that had any Army doctor recognized the disease in plaintiff, he would have considered plaintiff totally disabled as of that time. He also stated that if plaintiff had had a neurological examination while in the service, the disease would have been diagnosed. In opinion of this witness, plaintiff's double vision which began in 1938, and recurred from time to time thereafter, and was found by Army doctors not to be correctible by glasses "should have made somebody suspicious," because double vision occurring in an adult results from poisoning or from multiple sclerosis. He was of the opinion that plaintiff had been poorly examined.

In his closing statement to the Board at the hearing, plaintiff's counsel referred to the fact that plaintiff had in fact performed active military duty and performed it well, and that the disease from which he was then suffering went undetected. He urged the Board to consider the fact that because a man performs duty, he is not necessarily physically fit, and that this is peculiarly true of a man suffering from the disease of multiple sclerosis, which is totally unpredictable and incurable. He called attention to the memorandum of the Surgeon General to the effect that had the Army detected the presence of the disease, plaintiff in all probability would have

been considered totally disabled under the laws, rules and regulations and policies of the Army in effect at that time. Counsel also called the attention of the Board to the fact that the Veterans' Administration has a *minimum* rating of 30% for multiple sclerosis.

On the basis of the testimony and the record before the Correction Board, that Board on June 27, 1955, rendered its findings and conclusions. The findings adopted by reference the case summary of the examiner and the opinion of the Surgeon General of December 16, 1954. The conclusions reached by the Board were (1) that the plaintiff's disability was due to multiple sclerosis contracted while on active duty in 1938, but that the disease was undiscovered by the Army physical examination at the time of his relief from active duty on April 27, 1948; (2) that had the disease been detected at the time of separation in 1948, plaintiff in all probability would have been separated from service by reason of physical disability under the laws, rules, regulations and policies of the Army, then in effect, as being totally disabled; (3) that the applicant's symptoms in 1948 and previous thereto can now be considered as a justification for the diagnosis of multiple sclerosis which, although subject to periods of improvement, must be and is regarded as a progressive and incurable disease of the central nervous system; (4) that the failure of the Department of the Army to properly diagnose the disability prior to relief from active duty, and to separate the applicant by reason of physical disability, "was, and is, in error and unjust;" and (5) that plaintiff's incapacities are ratable as 100 percent disabling under the provisions of section 411, Public Law 351, 81st Congress (the Career Compensation Act of 1949, 63 Stat. 802, 37 U.S.C.A. § 281). The Board made the following recommendations:

"That all of the Department of the Army Records of Francis J. Proper be corrected to show:

"a. that he was permanently incapacitated for active service at the time of his relief from active duty on 27 April 1948, by reason of multiple sclerosis; that the incapacity originated in 1938; that such incapacity was an incident of service; that the incapacity was the result of an incident of service; that the applicant became incapacitated for active service on 27 April 1948 with a combined rating of 100 percent as determined under Section 411, Public Law 351, 81st Congress; and that the incapacity was not incurred in combat with an enemy of the United States, nor was it the result of an explosion of an instrumentality of war in line of duty;

"b. that he was relieved from active duty by reason of physical disability on 27 April 1948, and certified as eligible for retirement pay benefits under the provisions of the Act of 3 April 1939, in the grade of Captain; and

"c. that he elected prior to 1 October 1954 to receive disability retirement pay based on his percentage of disability at the time of such retirement, as determined under the provisions of Public Law 351, 81st Congress."

Two of the Board members noted their dissent and recommended no change in plaintiff's record. Among the reasons set forth as bases for the dissent was the fact that plaintiff was relieved from active duty after being found physically qualified in examinations which the dissenters stated had included "complete hospital studies". We note, in passing, that these examinations were hardly "complete" since admittedly no neurological examinations were made. Another reason advanced in the dissent was that the medical witnesses did not testify that plaintiff was unable to perform his duties at any time *nor that the medical examiners were in error in repeatedly finding him physically qualified.* As pointed out earlier in our discussion of the testimony at the Board hearing, the medical witnesses testified that although plaintiff actually performed his military

duties, the nature of his disease itself rendered him disabled since it was impossible to tell at what time or place his sight, depth perception, or ability to use his hands, or walk, would desert him. The medical witnesses also testified that a neurological examination during plaintiff's active duty service *would* have detected plaintiff's disease and that the double vision symptoms as far back as 1938 should have indicated the possibility of multiple sclerosis. The medical witnesses testified that the physical examinations made by the Army doctors were poor and incomplete and were in error in repeatedly finding plaintiff physically qualified for military service.

Our reasons for commenting upon the dissenting opinion of the two Board members, which opinion we think lacked any support in the record before the Board, will become apparent later in this opinion.

On July 21, 1955, Brig. Gen. E. C. McNeil, U. S. A. (Ret.), Special Assistant, OSA, addressed a memorandum to the Assistant Secretary of the Army relative to the case of this plaintiff, in which he summarized briefly plaintiff's military record, including his various hospitalizations. The memorandum noted that the Surgeon General had indicated that had the presence of multiple sclerosis been detected in 1945 or 1948, plaintiff would probably have been separated for total physical disability. The memorandum then stated:

> "By his own statements and briefs, statements by others who served with him and reports from civilian doctors, applicant contends that during service starting in 1938, he had episodes of double vision, tremors of the hands and head, emotional upsets, weakness of the kidneys, numbness of the legs, etc. Multiple sclerosis is a baffling disease, the symptoms of which come and go but progress. That is why SGO and other medical witnesses now say that it had its inception in 1938 when he first had double vision. His condition was not diagnosed as

multiple sclerosis until 5 July 1953 more than five years after his second relief from active duty.

ABCMR [Army Board for the Correction of Military Records] by a 3–2 vote corrects records to show he was physically unfit by multiple sclerosis, 100%, on relief from active duty 27 April 1948 and that he was certified for retired pay as a captain as of that date. *Mr. Taft and Mr. Bugg dissent,* concluding that he had *many thorough physical exams during his service and on 16 January 1953,* all of which found him not disabled, that to now find he was disabled is not consonant with reality as he did perform his duties in an excellent manner, that multiple sclerosis was not diagnosed until 5½ years after his separation *and there were not sufficient symptoms during service to permit such diagnosis;* it is a case for VA not for retirement.

*I agree fully with the minority.* There is no doubt he now has multiple sclerosis. But he performed duty for almost five years as an officer, including combat service in Burma; his ratings were four excellent and 8 superior. With this long record of duty excellently done, how can we now say that he was physically incapacitated at separation based on a diagnosis made 5½ years afterwards. No doubt the inception of multiple sclerosis came while he was in the service, as hindsight now shows, but he was not incapacitated by it. He became incapacitated in 1953 and is properly a case for VA. VA examined him in 1946 and 1949 but found no ratable disabilities; it was not till 14 October 1953 that VA rated him 100% for multiple sclerosis.

*Directive denying relief is attached for signature."* [Italics supplied.]

Several things are of interest in the above excerpt. The testimony heard by the Board was to the effect that there were sufficient symptoms as early as 1938

to have permitted a diagnosis of multiple sclerosis; that the disease might well have been suspected by even a general practitioner, because of the periodic spells of double vision, and that the only way the witnesses could account for the failure of the Army doctors to properly diagnose the disease was the fact that examinations were made during periods of remission of the symptoms, and that *at no time was plaintiff subjected to a neurological examination.* This latter fact, admitted by all, refutes the statement by the dissenters and by General McNeil that plaintiff received *many thorough physical examinations* by the Army and the Veterans' Administration. The record before the Board clearly established that with plaintiff's symptoms, about which he made no secret, no medical examination would be considered thorough which did not include a neurological study and that there were sufficient symptoms present during plaintiff's service to have permitted a diagnosis of multiple sclerosis.

Another important fact about the above memorandum opinion is that it was rendered by a military officer who was not a physician, and not by a civilian employee of the Department of the Army. The memorandum and the attached order were prepared for and directed to the Assistant Secretary of the Army and not to the Secretary.

On July 22, 1955, the day following the date of General McNeil's memorandum, the Assistant Secretary of the Army signed the order attached to the memorandum. The order read as follows:

"Having considered the findings, conclusions and recommendations of the Army Board for Correction of Military Records in the case of Francis J. Proper, O–1 294 237, and under the provisions of Section 207 of the Legislative Reorganization Act of 1946, as amended (Public Law 220, 82d Congress) and General

3. The new order changed the language "under the provisions of Section 207" to "under the authority vested in me by * * *."

Orders 26, dated 10 September 1954, it is directed:

"That in the case of Francis J. Proper, his undated application for correction of military records, received 17 September 1953, be, and hereby is, denied."

On September 8, 1955, by leave of the court, the plaintiff filed his amended petition alleging, among other things, that the Assistant Secretary of the Army had no authority in law to deny plaintiff's application. On November 28, 1955, the Secretary of the Army issued a new order in substantially identical language,[3] directing that the application for correction of his military records be denied.

■ Defendant takes the position that under the facts and circumstances of this case plaintiff does not have a claim, cognizable by this court, for disability retirement pay. Defendant advances several grounds for this conclusion. First, defendant urges that under the Act of April 3, 1939, 53 Stat. 555, 557,[*] providing for retirement for non-regular Army officers, and under the Act of September 26, 1941, 55 Stat. 733, 734, 10 U.S.C.A. § 456a, 38 U.S.C.A. § 12; and Executive Order 8099 (April 28, 1939), only the Secretary of the Army may determine eligibility for retirement benefits, including all questions of law and fact relating to such eligibility. Without passing on the matter of whether in all circumstances the Secretary's determination of non-eligibility for retirement benefits under those Acts will be final, we note that this claim arises not under the Acts of 1939 and 1941, but rather under section 207(a) of the Legislative Reorganization Act of October 25, 1951, 65 Stat. 655,[†] providing for the correction of military records by the Secretaries of the various services "acting through boards of civilian officers or employees." While, as defendant points out, the 1939 reserve officer retirement law is silent on the man-

* Now 10 U.S.C.A. §§ 3687, 3688, 3721, 8687, 8688, 8721.

† Now 10 U.S.C.A. § 1552.

ner in which the Secretary shall determine eligibility for retirement benefits, the Correction Board statute is not thus silent and provides that the correction shall be made through civilian boards. Section 207(a) provides in part as follows:

> "The Secretaries of the Army, Navy, and Air Force and the Secretary of the Treasury * * * respectively, under procedures set up by them, *and acting through boards of civilian officers or employees* of their respective Departments, are authorized to correct any military or naval record where in their judgment such action is necessary to correct an error or remove an injustice, and corrections so made shall be final and conclusive on all officers of the Government except when procured by means of fraud; * * *." [Italics supplied.]

In the instant case the Secretary of the Army, in denying plaintiff's application for correction of his military record, did not act through the Army Board of civilian officers or employees as required by the above statute. On the contrary, the Secretary of the Army wholly disregarded the finding of the civilian board that plaintiff had been totally and permanently disabled in line of duty at the time of his release to inactive duty on April 27, 1948, and, apparently acting through a retired regular Army officer, refused to correct plaintiff's record in the manner recommended by the civilian board. But defendant urges that the Secretary did not deed to act through a civilian board and that the recommendations of the Correction Board were merely advisory, leaving the Secretary free to accept and act favorably on the findings and recommendations, or to ignore them, as he saw fit. Such an interpretation of section 207 makes the words "acting through boards of civilian officers or employees" superfluous. Neither the act itself nor its legislative history warrants such an interpretation. Since the errors or injustices which might require correction were originally made by the military, Congress made it manifest that the correction of those errors and injustices was to be in the hands of civilians. We know of no case in which this issue has been decided, but the Comptroller General in an opinion reported at 32 Comp.Gen. 294 (1952), held that a correction or change in a military record made independently and contrary to the findings and recommendation of the Correction Board, was not made in accordance with section 207.

█ On the other hand, we do not suggest that the Secretary may not overrule the recommendations of the Correction Board where the findings of that Board are not justified by the record on which the findings were made. Defendant takes the position that in this case the record before the Board did not justify the findings made by the majority, but did justify the findings made by the dissenting members and the statements made by General McNeil in his memorandum. As we noted earlier herein, the record before the Board fully justified the findings of the majority and did not justify the statements made to support the dissenting opinion or the conclusions reached by General McNeil. Both the dissenting Board members and General McNeil stated that the record showed that plaintiff had many thorough physical examinations by the Army which failed to detect his disease. The record established that the examinations were *not* thorough because, with plaintiff's known symptoms, a neurological examination was strongly indicated. The dissenting Board members and General McNeil also stated that plaintiff's symptoms were not sufficient to indicate the presence of the disease. The record established that, beginning in 1938, plaintiff demonstrated classic symptoms of multiple sclerosis which should have made medical personnel suspicious, and which were sufficient to warrant a diagnosis of the disease. General McNeil stated that it was unrealistic to find that a man who performed such outstanding military service was incapacitated while so serving. The record before the Board clearly indicated the incapacitating nature of

multiple sclerosis, i. e., that because of the nature of this disease and its unpre-·dictability, a person suffering from it might, without any warning, lose control of his hands, legs, and vision, his bodily functions and his emotional stability, and in such a condition it seems apparent that he would be a danger both to himself and to .others with whom he was serving on active duty. The fact that this plaintiff through sheer will power, and the for-tuitous circumstances that the symptoms did not break out at a time during com-bat, when his lack of control would en-danger others, was able to render such excellent military service, does not mean that he was not incapacitated for such service by the disease.

We are of the opinion that on the rec-ord before the Correction Board, the find-ings of the majority were fully warrant-ed and that the Secretary, without the benefit of any additional evidence to the contrary, acted without proper authoriza-tion, contrary to law, section 207, supra, and the regulations of the War Depart-ment, in ignoring those findings and denying plaintiff correction of his mili-tary records as recommended by the Cor-rection Board.[4]

Plaintiff is entitled to recover disabil-ity retired pay accruing since his relief to inactive duty on April 27, 1948, and judgment is entered to that effect. De-fendant's motion for summary judgment is denied. Plaintiff's motion for sum-mary judgment is granted. The case is remanded to a commissioner of the court for a determination of the amount due pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and MADDEN, Judge, concur.

WHITAKER, Judge (dissenting).

What the majority has done in its opin-ion amounts to reviewing the actions of the Secretary as an appellate court would review the decision of a lower tribunal. It has reviewed his decision, denying the plaintiff retirement and, consequent-ly, retired pay, not only on a question of law but also on the facts. In effect, the majority says that the minority opinion of the Army Board for Correction of Mil-itary Records was wrong, and the major-ity opinion was right, and that the Secre-tary was arbitrary in not adopting the majority opinion.

But how can we say that the Secretary was arbitrary and capricious in adopting the view of the minority, and rejecting the view of the majority? Would the Su-preme Court be justified in saying that judges of this court, who had dissented from the opinion of the majority, were acting arbitrarily in not having con-curred with the majority?

It is not for us to determine whether the majority of the Board for Correction of Military Records or the minority was correct. Jurisdiction to determine an officer's right to retirement is vested in the Secretaries of the Army, Navy and Air Force. It is not vested in us and we have no right to review their decision unless we find that they had acted arbi-trarily. In my opinion, we can make no such finding in this case.

Nor do I agree that the Secretary is bound by the action of the Board for Cor-rection of Military Records. The Legis-lative Reorganization Act of October 25, 1951 (65 Stat. 655), does not vest in the boards for Correction of Military Rec-ords the right to correct an error or in-justice. It vests that authority in the Secretary. It merely permits the Secre-tary to set up such boards to aid him in determining whether or not an error has been committed or an injustice done. Section 207(a) reads in part:

"The Secretaries of the Army, Navy, and Air Force and the Secre-tary of the Treasury (with respect

4. Army Regulations 15–185 relating to the Army Board for Correction of Military Records, provides, among other things, that the Secretary may return the rec-ord to the Board for further considera-tion when deemed necessary (paragraph 20). This regulation would seem to have been designed for a case such as this where the Secretary disagrees with the findings and conclusions of the Board.

to the Coast Guard), respectively, * * * are authorized to correct any military or naval record where in *their judgment* such action is necessary to correct an error or remove an injustice, * * *" [Italics ours.].

This vests jurisdiction to correct the error or to remove the injustice in the Secretaries. The Act says that *they* "are authorized to correct any military or naval record where in their judgment such action is necessary" etc.

What I have omitted from the above quotation reads: "under procedures set up by them, and acting through boards of civilian officers or employees of their respective Departments." To me this means nothing more than that the Secretary may seek the aid of this board of civilian officers or employees of his department in order to arrive at a judgment; but, after all, the judgment to be rendered is the Secretary's judgment. He is not required to bow to the judgment of his subordinate officers and employees unless their judgment coincides with his judgment.

If I am correct in this, it cannot be said that the Secretary was arbitrary in adopting the view of the minority and rejecting the view of the majority of this board he had set up. It cannot be said that his action was arbitrary unless the law bound him to accept the judgment of this board. I do not think it does.

For the foregoing reasons, I respectfully dissent.

LARAMORE, Judge, joins in the foregoing dissenting opinion.