**Stephen R. PACKARD, Petitioner,**

v.

**Major General Andrew P. ROLLINS et al., Respondents.**

**No. 2472.**

United States District Court
W. D. Missouri, S. D.

April 11, 1969.

Richard B. Globus, Kansas City, Mo., for petitioner.

Calvin K. Hamilton, U. S. Atty., and Vernon A. Poschel, Asst. U. S. Atty., Kansas City, Mo., for respondents.

## MEMORANDUM OPINION

COLLINSON, District Judge.

This is a petition for writ of habeas corpus, brought by an officer in the United States Army, pursuant to 28 U.S. C. § 2241. The matter pends on respondent's motion for summary judgment. Pursuant to this Court's order, the parties have prepared a pretrial order, which states that there are no disputed facts in the case, and therefore the matter is properly presented for decision.

The undisputed facts may be summarized easily. Petitioner, now on active duty in the U. S. Army, enlisted on September 14, 1966. He voluteered for Officer Candidate School (OCS), and was accepted. He attended OCS, and was commissioned in 1967. Petitioner submitted a request for separation, on the grounds of conscientious objection, on September 26, 1968, which was disapproved on December 5, 1968. Petitioner was advised of the disapproval on December 11, 1968, by written message. The parties agree that the requirements of Department of Defense Directive 1300.6 (Subject: Conscientious Objectors) and Army Regulation 635–20 (Subject: Personnel Separation—Conscientious Objection) have been met with regard to the administrative procedures set forth therein.

Two issues are presented to the Court. At the threshold is the question of exhaustion of available remedies. If that issue is resolved in petitioner's favor, then the problem of whether or not there was a basis in fact for the denial of petitioner's request must be resolved. We turn to the threshold issue.

Respondent states that this Court should not choose to exercise its jurisdiction in this matter, because there is an available administrative remedy. This remedy is stated to be an application to the Army Board for Correction of Military Records (hereafter "Board"), which exists by virtue of 10 U.S.C. § 1552. In primary support of that position are two decisions by federal appellate courts.

Noyd v. McNamara, 378 F.2d 538 (10th Cir. 1967), concerned an Air Force officer who claimed to be a conscientious objector, and sought a duty assignment consistent with his conscience, or, alternatively, a release from the service. The Tenth Circuit, essentially adopting the opinion of the trial court, held that Noyd had not exhausted his remedies within the military, and that habeas would not lie. It is worthy of note that neither the Tenth Circuit or the trial court specifically mentioned the Board for Correction of Military Records. The thrust of the trial court's opinion, reported at 267 F.Supp. 701 (D.Colo. 1967) is that the Court would not interfere with the military in order to spare

the plaintiff military justice. A court martial was apparently the "remedy" involved in that case, and plaintiff was required to travel the military justice route, where it is assumed that his rights will be fully protected.

■ The Court notes that Noyd had made it clear that his objection to war was directed almost exclusively to the Vietnam situation, and was not opposition to war in general. Noyd can be read as holding that the civil courts will not review military duty assignments. Consider this statement from the affirming decision of the Tenth Ciruit, 1. c. 378 F.2d 540:

"The essence of appellant's claim is that the federal judiciary should review and determine the validity of military assignments to duty. This we cannot do."

However, the leading case in this area is a recent decision by the Ninth Circuit, handed down March 5, 1969, and not yet reported. In these cases, Craycroft v. Ferrall, et al., and Craycroft v. Clifford, et al., 408 F.2d 587 the Ninth Circuit flatly held that an in-service conscientious objector would be required to apply to the Board for Correction of Naval Records before he could be properly in the civil courts. The Ninth Circuit notes that several courts have required that military administrative remedies on discharges of retirement orders are not exhausted before application to the appropriate Board. Many courts have done so, and quite properly in situations pertaining to the kind of discharge awarded, or the particular rank at which a man should be retired. The Board for Correction of Military Records is obviously set up to handle that type of action, and was created for that function. Whether or not the various Boards were created for this review of military determinations in the conscientious objector cases is another question entirely.

The Court notes in passing that the Ninth Circuit cited Ogden v. Zuckert, 111 U.S.App.D.C. 398, 298 F.2d 312 (1961) as holding that one must apply to the Board before coming into the civil courts. We are unable to read it in that manner. That Court said, at 317:

"We conclude that jurisdiction of the court was not precluded by the omission of plaintiff to seek relief through the Board; but we also conclude that on the remand the court may, in its discretion, refrain from exercising jurisdiction to decide the case pending plaintiff's pursuit of relief at the hands of the Secretary acting through the Board, the court in the meantime retaining jurisdiction. * * * "

On the other hand, petitioner cites several cases for the proposition that he is not required to proceed to the Board before seeking habeas corpus. Among them he cites Gann v. Wilson, 289 F. Supp. 191 (N.D.Calif.1968). This case is closely similar to *Gann*; both concern in-service conscientious objectors, both petitioners had voluntarily entered active duty, and in both the respondent contended that the Board "remedy" should have been exhausted. The *Gann* court had this to say at 193:

"Neither is it necessary for him to petition the Army Board for Correction of Military Records before seeking judicial relief from action taken by the Department of the Army which he claims to be arbitrary, and which by Department of Defense Directive 1300.6 is made final."

A Board similar to the Army Board for Correction of Military Records was involved in Girault v. United States, 133 Ct.Cl. 135, 135 F.Supp. 521 (Ct.Claims 1955). There, a unanimous Court said at 526:

"It would be nonsensical to require a plaintiff making such an allegation to go before this Review Board before coming to court, since the decision of the Review Board, to have any binding effect, had to be approved by the same Secretary of War whose prior decision was alleged to have been arbitrary."

* * * * * *

"All of these boards, the Retiring Board, the Disability Review Board, and the Board for Correction of Military Records act only in an advisory capacity to the Secretary of War. If his decision on the retirement rights of an officer is alleged to have been arbitrary, then the officer's right to come to the court for redress accrues as soon as the arbitrary decision is rendered."

Ogden v. Zuckert, supra, discusses the decisions of the Court of Claims in this area. The *Ogden* court noted that the Court of Claims had modified its position slightly from the one stated in *Girault*, supra. Having noted that, the Court said, 298 F.2d at 315:

"* * * [W]e conclude that the court was not deprived of jurisdiction by plaintiff's omission to seek Board consideration. Several factors lead to this conclusion. The statute under which the Board was established obviously was intended by Congress to take the place of private bills for relief from error or injustice at the hands of the Armed Services. There is no indication of congressional consciousness or intention that judicial jurisdiction would be affected. This may be due in part to the absence of any legislative provision for judicial review of the Secretaries' actions in such matters, but the fact remains that no intention is evidenced to preclude judicial review as previously authorized by court decisions. The congressional plan is for the Boards to assist the Secretaries in correcting errors and injustices in military records. This plan was not designed to bring the Boards into the original administrative process of making the records, a process which is participated in by the various other boards, referred to earlier in this opinion, which considered and reviewed plaintiff's case before the Secretary acted.

\* \* \* \* \* \*

The Board furnishes a means by which to seek correction of error or injustice, but neither statute nor regulation requires this means to be pursued as a condition to finality of the Secretary's action. The relief which might ensue after Board consideration, similar to relief previously obtained by private bills enacted by Congress, is through a procedure over and above that which guides the administrative process itself to its end. It is a part of a different and subsequent procedure."

The Court, after analyzing the various Court of Claims decisions in this area, then concluded that failure to seek relief from the Board did not deprive the trial court of jurisdiction, though the trial court could require such application.

The Court notes that *Ogden* has been limited by a later decision of the District of Columbia Circuit, Sohm v. Fowler, 124 U.S.App.D.C. 382, 365 F.2d 915, wherein the Court said, at 918:

"This policy (that administrative remedies should be exhausted), although subject to the exercise of discretion, has been applied by numerous courts in the context of the Boards for Correction of Military Records, and it has evolved to the point where it can be formulated as a rule that the administrative remedy should be exhausted unless the party invoking the court's jurisdiction can demonstrate special circumstances."

But that same court distinguished *Ogden* on the facts, since in *Sohm* the Board had already indicated a willingness to hear the case, and since in *Sohm* the matter at issue was one over which the Board clearly had authority.

The latest case in this area is Brooks v. Clifford, et al., 409 F.2d 700, which the Fourth Circuit handed down on March 20, 1969. The facts, if not on all fours with those here in issue, are at least on threes. Petitioner voluntarily enlisted in the Army, and later sought to be discharged as a conscientious objector. The Army denied his request, and he sought the great writ. The district court denied his request, holding

that there was a basis in fact for the denial; but the Fourth Circuit reversed and directed that the writ issue (giving the Army time to discharge petitioner voluntarily *if they choose to do so*). On the exhaustion issue, that court said:

> "Additionally, we reject, as did the district court, the notion that petitioner has failed to exhaust his administrative remedies within the Army by failing to seek a correction of his records." (Citing *Gann* and the cases cited therein.)

This Court is presented with a case on which the appellate courts differ, and our own appellate court has not been heard. Other factors influence our decision here. It is certainly not in the interests of the country to permit servicemen to choose their forum at will; it is not the function of judges to run the Army; the doctrine of exhaustion of available remedies, when adequate, is well established and well reasoned; and the military cannot be effective if it does not have control over men on active duty and in the reserve.

However, we deal with an area in which the trial court has a good deal of discretion. As Mr. Justice Brandeis stated in United States v. Abilene & Southern Ry., 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016, at 282, 44 S.Ct. at 567:

> "Whether it (the district court) should have denied relief until all possible administrative remedies had been exhausted was a matter which called for the exercise of its judicial discretion."

The Army Board for Correction of Military Records was established to relieve Congress of the often burdensome amount of "private" bills introduced on behalf of individuals. 41 Op.Attorney General January 1951, 40 Op.Attorney General 504, 1947. The language of the four sections authorizing various Boards is directed toward this goal. It contains no hint that Congress intended it to function as part of the decision making process, especially in the case of those members of the military currently on active duty. The statutory language is directed toward a civilian correction of errors made during the military decision process.

Further, it is the Secretary of a military department who corrects the error, at the recommendation of the Board concerned. Although he cannot ignore the findings of the Board, he may overrule them if not justified by the record before the Board. Proper v. U. S., 139 Ct. Cl. 511, 154 F.Supp. 317 (1957).

It seems somewhat anomalous to require petitioner to appeal to a board not set up for this type of case, which makes recommendations (which may not have to be followed) to the same individual who necessitated the appeal to the Board by reason of a decision adverse to the petitioner. And doubly so in light of the regulations prescribed by the Department of Defense and the Department of the Army, which both provide that the determination of status by the Department of the Army is final. Respondent cannot have it both ways. If the initial determination by the Secretary of the Army is final, it is just that: If it is not, the Army regulations in point should provide for review by the Board *before* a final decision is made by the Secretary, not after.

Having made regulations in this area, which govern the administrative procedures involved, respondent must follow them. See Roberts v. Vance, 119 U.S. App.D.C. 367, 343 F.2d 236 (1964).

■■ This Court chooses to exercise its discretionary jurisdiction and reach the merits of the case. The Great Writ should not be hamstrung so as to deny consideration of a rightful claim. The Supreme Court noted, in Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), at 243:

> "It (the Great Writ) is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrong-

ful restraints upon their liberty." (Quoted with approval in Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968).

We turn to the basis in fact issue. Army Regulation (AR) 635–20 governs this area. It provides that military personnel will submit an application for discharge containing general information and detailed data in regard to their religious training and belief. If the applicant has served more than 180 days (as petitioner has here), he is required to state his willingness to engage voluntarily in post-military work in the civilian work program administered by the Selective Service. Petitioner has done so.

The regulation further provides that an applicant for discharge must receive a counseling interview by a chaplain, and a psychiatric interview by a psychiatrist, and also has the opportunity to appear before an officer knowledgeable in policies and procedures related to conscientious objector matters. That officer is required to enter his recommendation and the reasons therefor. The application with its supporting documents and these additions is then forwarded through channels to the Department of the Army, where a "final" determination is made.

Petitioner submitted his application in proper form. In that application, he stated that:

"I believe that there is a universal power on a scale and magnitude beyond the understanding of the mind of man. * * * Before the beginning of written history certain religious beliefs and philosophies on the meanings of human life developed. With written history we have record of some of these religious beliefs. I have chosen to adopt the religious philosophy of Jesus Christ as my highest and most adhered to belief. Christianity has taken a law that is expressed in various ways in many religions. Commonly referred to as 'The Golden Rule,' it states, 'Do unto others as you would have do unto you.' * * * 'The Golden Rule' has

been amended by Christianity to read 'Love thy neighbor as thyself.' I believe that this principle is the highest, most honorable course for man. For this reason I say that no man is ever justified in killing another man. I cannot justify my participation in war or an organization formed to wage war * * *."

* * * * * *

"In support of the sincerity of my beliefs in Christianity, there is a pattern in my physical behavior that is nonviolent. In my memory I cannot find one instance where I struck a person with the intention to do bodily harm. * * *"

Petitioner stated that he is a member of the United Church of Christ, which has as one of its tenets an affirmation of the recognition of conscientious objection for those members who " * * * [F]or conscience' sake seek exemption from military service and elect the alternative of civilian national service, * * *."

Petitioner further stated that for three years he was a member of the Evanston Youth Conference, a religiously oriented conference. Petitioner was on the planning board of that organization.

The officer knowledgeable in conscientious objector matters had this to say:

"I don't feel that Lieutenant Packard presented evidence of a sincere conviction based on religious training and belief, however, I do believe that Lieutenant Packard is sincere in his objection to further military service.

At no time during the interview did Lieutenant Packard relate an active religious role in present or past activities. He alluded to terms and phrases such as 'war machine,' 'force versus violence,' 'arguments for war,' and 'military psychological suppression of thought and conviction', but was unable to clarify how they related to his case.

He can't really say when his conflict of service and conscience began to

take form but states that through a great deal of self appraisal it has formulated over the past year. It is my opinion that this officer's opposition to participation in war in any form and further service in the Armed Forces of the United States is not based on religious training and belief."

The chaplain, after two interviews with petitioner, stated:

"It is my opinion that Lt. Packard is sincere in his convictions. However, it is my judgment that his conviction is based upon emotional, sociological and philosophical grounds and not on religious beliefs."

Petitioner's commanding officer stated that he thought petitioner was sincere, but that this objection derived from a personal need to stand against something, and that the Vietnam war provided the answer. He concluded that "Based on the above, I believe that Lieutenant Packard's request for classification as a conscientious objector is essentially political, sociological, and philosophical."

Petitioner made a statement regarding the last two recommendations as follows:

"I question the validity of their recommended disapproval on the grounds that my beliefs are essentially sociological, philosophical, and political in nature. There was little attempt to delve deeply into my religious beliefs. The fact that I hold strong views in sociological, philosophical, and political areas does not preclude the fact that my religious convictions are my guiding principles in the areas discussed.

My answers to and views on sociological, philosophical, and political problems were and are in line with my religious convictions. In fact, they encompass all these areas."

Included with the file are thirteen letters from various persons who know petitioner, and were asked to give statements pertaining to his beliefs. Mr. Bolef, a Professor of Physics, said:

"I have found him to be an honest, sincere young man who is deeply concerned with the conflict between his religious beliefs and the demands placed upon him by the Army. It has become clear to me that he is a person whose conscientious beliefs do indeed force him to avoid engaging in actions which can lead to violence and combat."

Another Army Officer, Lt. Burke, had this to say:

"When Lieutenant Packard first mentioned to me his thoughts about conscientious objection I was not surprised. I feel that he is sincere in his belief, and I believe that this belief is fostered by a very intense sense of the Christian ethic in which he was raised. I think his belief is in keeping with his personality and his concerned attitude about man and his relation to his fellow man."

The Assistant Head Resident in the Dean of Students office at Indiana University writes:

"For an extended period of time I have been employed by the Dean of Students Office of Indiana University as a counselor, and my experience in this area has brought me in contact with various types of personal concerns and personalities, including many spurious and indeed questionable attitudes * * * I feel confident that I recognize the difference between doubtful beliefs and those that are sincere. In my eleven years of association with Steve * * * Steve has always continued to be a genuine freethinking individual, and his application as a conscientious objector is certainly in agreement with his life as a I have known it."

His brother states:

"Steve hasn't had a devout religious upbringing in the sense of regular family worship in a church. We're all members of the First Congregational Church in Evanston, and our father is

a Deacon of the church, but attendance, by habit, has been an individual choice. Our customary family grace at table is always silent; we've been raised to believe that true religion comes from within, and not from the repetition of accepted forms and rituals. We've always been encouraged by our parents to learn about, and question the validity of, religious teachings, and we've grown up in a remarkably rich cultural and intellectual environment in which to do this."

A friend writes:

"Through our many discussions, I found that Stephen mainly revered Christ's teachings about human love and pacifism. In accord with the Christian way of life as Stephen sees it is the abhorrence of the destruction of human life, for whatever reason. Naturally, Stephen's interpretation of Christianity precludes aggression against any man."

Petitioner's minister writes:

"For the past seven years I have been associated with Steve and his family, while serving as a minister of their church. * * * In all these instances what he has said and done would seem to be consistent with what he is now attempting to do; take a stand as a CO. * * * I have no doubt but that his current stand in opposition to participation in war is by reason of his religious training and belief."

Another Army Officer writes:

"The difference between our viewpoints stems from beliefs derived during our childhoods. We were both brought up as protestants, attending Sunday School and church services avidly. As a result of differences in teachings at church, in school and at home, Lt. Packard learned that it is best to avoid all violence by utilizing the power of reason while I maintained a toleration for violence."

Petitioner attempted to have included in the record a letter from his mother. The Court did not consider this letter as part of the file, since that letter was not before the military authorities when they reviewed the file.

The final question remains. Was there a basis in fact for the denial of this application? Here, too, the Courts differ in stating the standard. We believe that the Fourth Circuit analysis in *Brooks*, supra, correctly states the test used by the Supreme Court in United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

In discussing beliefs based on "a merely personal moral code," the *Seeger* Court said, at 186, 85 S.Ct. at 864:

"[T]he use by Congress of the words 'merely personal' seems to us to restrict the exception to a moral code which is not only personal but which is the *sole basis* for the registrant's belief and is in no way related to a Supreme Being." (Emphasis added)

The interpretation of *Seeger*, given in *Brooks*, supra, accords with a 1965 Tenth Circuit decision, Fleming v. United States, 344 F.2d 912. At 915, that Court said:

"As we read the *Seeger* case, it clearly lays down the rule that before a conscientious objector classification may be denied on the ground that the applicant's beliefs are based upon 'political, sociological, or philosophical views or a merely personal moral code', those factors must be the sole basis of his claim for the classification."

This seems to be a reasonable interpretation of *Seeger*. Individual determinations of the sincerity and source of each applicant's beliefs must perforce be made in every case. But it would be an unduly restrictive reading of *Seeger* which would totally exclude any genuine belief because it was in part induced by readings or study in philosophical or moral areas. The disciplines are too interrelated to permit sharp distinctions of that nature.

In view of the fact that each of the Army officers processing the application attested to the sincerity of the be-

lief, and in view of the excerpts quoted above from the supporting documents, the Court holds that Packard's beliefs, though partially grounded on other than religious grounds, are primarily based on religious beliefs. It is

Ordered that respondents' motion for summary judgment be denied, and further

Ordered that the petition for writ of habeas corpus be granted, and the writ shall issue, conditioned on the provision that petitioner, in accordance with his expressed desires, serve in the civilian work program administered by the Selective Service system for a period of time equal to that of his remaining active duty obligation, and it is further

Ordered that the effective date of the writ be stayed for two weeks from this date, to allow respondent time to discharge petitioner under the appropriate regulations. If respondent does not choose to do so, the writ will issue forthwith.