70 F.3d 1290
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
Michael C. WADE and Claudia D. Wade, Plaintiffs-Appellants,
v.
The UNITED STATES, Defendant-Appellee.
 No. 95-5057.
 United States Court of Appeals, Federal Circuit.
 Nov. 27, 1995.
 
 Before RICH, SCHALL, and BRYSON, Circuit Judges.
 DECISION
 PER CURIAM.
 
 
 1
 Michael C. Wade and his wife Claudia D. Wade seek review of a decision of the United States Court of Federal Claims, Docket No. 95-5057. The court granted summary judgment to the government on the claimants' suit to recover military disability benefits in excess of those that the Navy awarded to Michael Wade upon his discharge. We affirm.
 
 BACKGROUND
 
 2
 Michael Wade is a former Navy flight officer. After a 1981 accident upon takeoff from an aircraft carrier, Wade began to suffer medical problems, including back, neck, and shoulder pain, recurrent nightmares and anxiety, blurred vision, dizziness, muscle spasms, headaches, and disorientation. He was diagnosed with post-traumatic stress disorder stemming from the accident. Before his discharge from the Navy in 1985, Wade was also examined by six neurologists and several other specialists. Although most could not rule out the possibility of multiple sclerosis (MS), only one diagnosed Wade with that disease.
 
 
 3
 A Medical Evaluation Board was convened in 1985 and diagnosed Wade with "Post-traumatic stress disorder, chronic, severe, ... L1 compression fracture, old, healed, ... [and] arthritic pain, right knee, old." The Board rejected Wade's contention that he should be diagnosed with MS as well. Referring to his post-traumatic stress disorder, the Board concluded that Wade "suffered from a psychiatric disorder which preclude[d] his rendering any further useful military service."
 
 
 4
 The Central Physical Evaluation Board agreed with the Medical Evaluation Board's diagnosis and found Wade unfit for further military service due to physical disability. For disability benefit purposes, Wade's post-traumatic stress disorder was rated at 10 percent, and his other injuries were rated at zero percent.
 
 
 5
 After a hearing, the Regional Physical Evaluation Board changed the Central Physical Evaluation Board's diagnosis of post-traumatic stress disorder from "chronic, severe" to "less than definite," but otherwise concurred in the Central Physical Evaluation Board's findings of unfitness and its rating of post-traumatic stress disorder at 10 percent.
 
 
 6
 The Physical Review Council, the next stage of the disability evaluation appeal process, concurred with the Regional Physical Evaluation Board's findings. Wade then petitioned the Secretary of the Navy, who denied relief on the ground that the evidence did not support a diagnosis of MS. In response to Wade's argument that a Navy regulation, 38 C.F.R. Sec. 4.131, mandated a minimum rating of 50 percent disability for psychiatric disorders that render a service member unfit for duty, the Secretary interpreted that regulation to apply only to disorders that are the direct result of war. On December 31, 1985, Wade was discharged from the Navy and was awarded $64,094 in disability severance pay.
 
 
 7
 Between 1985 and 1993, Wade was examined by a number of doctors both in private practice and in the Veterans Administration (VA). In 1990 the VA for the first time confirmed that Wade was suffering from MS. In 1991, the VA made that diagnosis retroactive to January 1, 1986, the day after Wade's discharge.
 
 
 8
 Wade applied to the Board for Correction of Naval Records (BCNR) to have his records revised to show a retirement from the Navy by reason of physical disability with diagnoses of post-traumatic stress disorder (ratable at 50 percent), MS (ratable at no less than 30 percent), and residual spinal injury (ratable at no less than 10 percent). A medical advisory opinion provided to the BCNR concluded that Wade's claim that he suffered from MS at the time of his discharge could not be substantiated with certainty. One of Wade's physicians responded that in his opinion Wade had MS as of 1982, and that the condition was diagnosable by 1984.
 
 
 9
 The BCNR denied Wade's application on the ground that it was not persuaded that Wade was suffering from MS at the time of his discharge and that he was not entitled to increased ratings for his post-traumatic stress disorder or spinal injury. The Board thus found no material error or injustice in the results of the disability evaluation system. After reviewing Wade's medical records, the Board expressed the view that Wade had provided misleading and false information to the Navy over the years. Thus, the Board concluded that even if there had been material error or injustice, "basic principles of equity would not demand that any corrective action be taken."
 
 
 10
 After the BCNR's decision, Wade asked the Court of Federal Claims to set aside the administrative determinations against him. Wade asserted that he should have been diagnosed with MS, that the BCNR erred by injecting unsubstantiated allegations of fraud into its decision, that the Medical Evaluation Board ignored relevant evidence and violated its own regulations by failing to include Wade's primary care physician on the Board, that the opinions of the medical reviewing boards within the Navy were "naked conclusions" with no explanation, and that Navy regulations required his post-traumatic stress disorder to be rated at no less than 50 percent.
 
 
 11
 The court granted summary judgment for the government. It first found that there was substantial evidence to support the BCNR's decision and that the BCNR had not based its decision on the allegations of fraud. The court then held that although the Medical Evaluation Board violated its own regulations by excluding Wade's primary care physician from the Board, the error was harmless, because his inclusion would not have changed the Board's decision. The court also found unsubstantiated Wade's charge that the Medical Evaluation Board ignored medical reports from several neurological and psychological consultations. As to the asserted failure of the reviewing boards to provide reasons for their conclusions, the court agreed with Wade that the boards' explanations were "woefully inadequate." Nonetheless, the court found that in light of the Medical Evaluation Board's report, the extensive medical records, and the detailed explanation by the Secretary of the Navy, the evidence in the record was sufficient to justify the reviewing boards' decisions. Finally, the court ruled that the Navy was not required to rate Wade's post-traumatic stress disorder at a minimum of 50 percent. The court held that a 50 percent rating is allowed under 38 C.F.R. Sec. 4.132 only if it is shown that the claimant's "[a]bility to establish or maintain effective or favorable relationships with people is considerably impaired." The court ruled that Wade's denial that he suffered such an impairment justified the Navy's decision to rate his post-traumatic stress disorder at only 10 percent.
 
 DISCUSSION
 
 12
 In this action to set aside decisions of the Navy's disability evaluation system and its corrections board, Wade bears the burden of proving that the Navy's administrative action was "arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which [the plaintiff] has been seriously prejudiced." Heisig v. United States, 719 F.2d 1153, 1156 (Fed.Cir.1983). Furthermore, Wade must prove a violation by "cogent and clearly convincing evidence." Wronke v. Marsh, 787 F.2d 1569, 1576 (Fed.Cir.), cert. denied, 479 U.S. 853 (1986); Finn v. United States, 548 F.2d 340, 342 (Ct.Cl.1977). Our review of the Navy's decisions does not allow us to reweigh the evidence and decide whether the Navy's conclusions were correct, but only to review whether its conclusions were supported by substantial evidence in the record. Heisig, 719 F.2d at 1157.
 
 
 13
 Having reviewed the record in this case, we agree with the careful opinion of the Court of Federal Claims in all significant respects. We therefore will not treat in detail all the points raised by the appellants, most of which are comprehensively addressed in the trial court's opinion.
 
 
 14
 * Wade argues that the decision by the Navy that he did not have MS at the time of his discharge is not supported by substantial evidence. He relies on Proper v. United States, 154 F.Supp. 317 (Ct.Cl.1957), in which the court found no substantial evidence to support the Army's refusal to correct its records to state that Proper, a former Army officer, had been suffering from MS at the time of his discharge. Proper exhibited symptoms of MS while on duty but was not diagnosed with the disease until after his separation from the service. As the government notes, Proper had exhibited symptoms while in the service, but none of his doctors had even recognized the possibility of MS, and thus no neurological tests had been performed while he was in the service. Additionally, three of the four neurologists who diagnosed Proper with MS dated the onset of the disease to his time in the service. Finally, the Army corrections board in Proper, by a 3-2 vote based on an advisory opinion of the Surgeon General and the urging of the case examiner, had recommended correction of his records to reflect his having MS at time of separation, a recommendation that was disregarded by the Secretary of the Army without medical support. Proper is therefore readily distinguishable from this case, in which the evidence supporting the Navy's decision is much stronger.
 
 
 15
 The issue before us is whether substantial evidence supports the Navy's finding that Wade was not suffering from MS at the time of his discharge. Although there is evidence supporting Wade's argument that he had MS at that time, there is substantial evidence in the record supporting the Navy's contrary determination. Thus, while Wade's post-discharge medical history is relevant to our review, it does not negate or invalidate the evidence that supports the Navy's decision.
 
 B
 
 16
 Wade argues that the medical reviewing boards issued their decisions concurring in the Medical Evaluation Board's original findings without adequate explanations. He contends that under Istivan v. United States, 689 F.2d 1034 (Ct.Cl.1982), a decision is arbitrary and capricious if it is accompanied by only a "naked conclusion" or a mere recitation that the decision is based on all the evidence. This court, however, has not insisted on "sterile formality," but has held that it is sufficient if "we are not left completely in the dark as to the facts and evidence upon which the [Secretary] ... based his judgment." Selman v. United States, 723 F.2d 877, 881 (Fed.Cir.1983), cert. denied, 467 U.S. 1226 (1984).
 
 
 17
 In Istivan, prior boards had consistently rated Istivan's disability at 30 percent, but the final board changed the rating to 10 percent with practically no explanation. On those facts, the court held that without an explanation by the final board, the court could not find substantial evidence in the record to support the sudden reversal of prior decisions. In the instant case, the Medical Evaluation Board issued a review of Wade's medical history and made recommended diagnoses. The medical reviewing boards in essence affirmed the Medical Evaluation Board's conclusions. Given the Medical Evaluation Board's findings, we are not "in the dark" as to the facts and evidence upon which the various boards relied, and we can discern substantial evidence in the record justifying their conclusions.
 
 C
 
 18
 Wade argues that the Navy's failure to rate his post-traumatic stress disorder at a minimum of 50 percent was contrary to 38 C.F.R. Sec. 4.131.
 
 
 19
 The Central Physical Evaluation Board must determine, first, whether a service member's medical problems render him unfit for active or limited duty in the Navy, and then must rate the service member's disabilities in accordance with the Schedule for Rating Disabilities. The Schedule sets forth a list of medical conditions, which are broken down into degrees of severity ranging from zero to 100 percent disability. Each category is accompanied by a description to assist the decisionmaker in rating the member's disability. For example, the 50 percent rating for post-traumatic stress disorder is described as follows: "Ability to establish or maintain effective or favorable relationships with people is considerably impaired. By reason of psychoneurotic symptoms the reliability, flexibility and efficiency levels are so reduced as to result in considerable industrial impairment." 38 C.F.R. Sec. 4.132. The Navy found that Wade did not fall within this category, and instead rated his post-traumatic stress disorder at 10 percent. It based its decision at least partly on Wade's testimony at his Regional Physical Evaluation Board hearing that the post-traumatic stress disorder had not affected his ability to establish or sustain personal relationships. For that reason, the Court of Federal Claims found the Navy's rating of post-traumatic stress disorder was not contrary to the guidelines in 38 C.F.R. Sec. 4.132.
 
 
 20
 In addition to or in lieu of the descriptions for various ratings of particular disabilities, some disabilities are assigned a minimum rating level. In those cases, the decisionmaker may not assign a rating below the prescribed minimum. The section on which Wade relies, 38 C.F.R. Sec. 4.131, prescribes a minimum rating for anyone diagnosed with a mental disorder, including post-traumatic stress disorder, when the disorder has its roots in specific circumstances and is severe enough to warrant his discharge from the service. It states:
 
 
 21
 Certain mental disorders having their onset as an incident of battle or enemy action, or following bombing, shipwreck, imprisonment, exhaustion, or prolonged fatigue may at the onset be designated as gross stress disorder, "combat fatigue," "exhaustion," or any one of a number of special terms. These conditions may clear up entirely, permitting return to full or limited duty, or they may persist as one of the recognized mental disorders, particularly generalized anxiety disorder, or recur as post-traumatic stress disorder. If the mental disorder is sufficiently severe to warrant discharge from service, a minimum rating of 50 percent will be assigned with an examination to be scheduled within 6 months from discharge.
 
 
 22
 The Navy interpreted this section as applying only when the mental disorder is caused by war. Wade argues that the Navy's interpretation is too narrow and that the section should be read to include his situation, a post-traumatic stress disorder directly caused by an aircraft accident during carrier operations simulating combat conditions.
 
 
 23
 Regardless of whether the Navy's interpretation is correct, the regulation clearly does not extend to circumstances such as those that led to Wade's post-traumatic stress disorder. Wade's aircraft carrier accident was not "an incident of battle or enemy action," and it does not qualify as "bombing, shipwreck, imprisonment, exhaustion, or prolonged fatigue." The 50 percent rating requirement of Section 4.131 was therefore not applicable to Wade's condition.