Jesse L. HORN, Appellant,

v.

Honorable James R. SCHLESINGER,
Secretary of Defense, et al.,
Appellees.

No. 74–1821.

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1975.

Decided April 29, 1975.

**550**

Francis L. Ruppert, Clayton, Mo., for appellant.

Captain Alvin Thomas, JAGC, Dept. of the Army, Washington, D. C., for appellees.

Before VAN OOSTERHOUT, Senior Circuit Judge, ROSS, Circuit Judge, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

 The appellant before us (hereinafter plaintiff), a former United States Army Major, was discharged from the service for his alleged ·failure to meet the standards required for promotion in rank.[1] His bill of complaint[2] sought review of this discharge and reinstatement to active status in the United States Army. The District Court granted defendants' motion for summary judgment on the ground that plaintiff had failed to exhaust his administrative remedies. We agree and affirm.

The issues presented revolve around two Officer Efficiency Reports (OERs) and the processing thereof. These periodic reports constitute an appraisal of the officer's performance of ·duty; "[a]n individual's failure to receive OERs competitive with other officers similarly situated can, especially with today's contracting military manpower, result in passovers [promotion non-selection] and involuntary separation from active duty."[3] The reports in controversy here cover the periods from 26 May through 4 October 1970 (OER 1) and from 5 October 1970 through 31 August 1971 (OER 2). They are considered by plaintiff to have caused or contributed to his failure of promotion.

In May, 1973 plaintiff appealed OER 1, alleging that "the rating officer who made the disputed OER was contrary to" an Army regulation[4] requiring that "Reports are [to be] completed at the lowest level possible in order to obtain two accurate and considered opinions based on the closest possible knowledge and observation of the officer." Plaintiff asserted in his appeal that "Colonel Pruett was the officer who should have performed the function of rating officer" and not Colonel Bonifas.

The Army Special Review Board, which heard the appeal, held that the evidence presented did not warrant remedial action thereon. Plaintiff then appealed to the Army Board for the Correction of Military Records (ABCMR)[5] which denied the application on January 16, 1974 "on the basis that insufficient relevant evidence had been presented to demonstrate the existence of probable material error or injustice." This was held to be "without prejudice to further consideration in the event new relevant evidence is submitted (paragraph 10b, Army Regulation 15–185)."

---

* Talbot Smith, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. 10 U.S.C. § 3303 requires the discharge or forced retirement of certain officers who have been considered twice but not selected for promotion.

2. Counts I and II pertained to plaintiff's efficiency reports, charging failures to properly prepare, evaluate and process. Count III alleged that the appeal procedures therefor were vague and arbitrary, depriving plaintiff of due process. Count IV charged that defendants' evaluation procedures employed vague and unreasonable standards, and that plaintiff's discharge based thereon was violative of due process.

3. Glosser & Rosenberg, Military Correction Boards: Administrative Process and Review by the United States Court of Claims, 23 Am. U.L.Rev. 391, 403 (1973) [hereinafter cited as Glosser].

4. AR 623–105 ¶ 1–3b (March 6, 1970), as amended, AR 623–105 ¶ 1–4b (May 15, 1974).

5. See notes 9–11, infra, and accompanying text.

Meanwhile, on July 11, 1974, plaintiff had appealed OER 2 to the Special Review Board. His complaints respecting OER 2 were similar to those asserted concerning OER 1. It was alleged that Colonel Pruett rather than Lieutenant Colonel Hallinan should have performed the function of rating officer. The appeal of OER 2 was denied by the Special Review Board on grounds similar to those stated with respect to OER 1. New and additional evidence concerning both OER 1 and OER 2 was then submitted, on September 20, 1973, to the Special Review Board, and it again denied relief. OER 2 was not submitted to the ABCMR.

Thus with respect to the two OERs complained of, a part only (absent the new and additional evidence submitted on September 20, 1973) of one claim, OER 1, was ruled upon by the ABCMR. OER 2 was not submitted to such Board and hence, of course, not ruled upon.

The defendants urge to us that plaintiff has not exhausted his administrative remedies. We share, with other courts that have addressed the point, the traditional judicial reluctance to interfere with the military establishment. This is not to say that it will never be done when grave constitutional rights seem imperiled, as the court-martial [6] and selective service [7] cases well attest. But in judgments requiring military expertise and involving military discretion within unique professional fields this long-established view found apt expression in Orloff v. Willoughby, 345 U.S. 83, 93–94,

73 S.Ct. 534, 540, 97 L.Ed. 842 (1953) where the Supreme Court, after noting that "judges are not given the task of running the Army," stated that "[t]he responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates." And, further,

The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to interfere in judicial matters.

It is at this point—legitimate Army matters—that our duty in the premises becomes clear. What we have here are allegedly erroneous and adverse OERs which have resulted in plaintiff's separation from active duty. As to OER 1, as we have noted, it is alleged that Colonel Pruett should have been the rating officer and not Colonel Bonifas, whereas for OER 2 Colonel Pruett again should have been the rating officer and not Lieutenant Colonel Hallinan. The degree of involvement with internal Army organization and procedures that this question presents may be gleaned from plaintiff's arguments on this point in his appeal to the Army Special Review Board, a portion of which (respecting OER 1, though OER 2 is similar) appears in the margin.[8]

---

6. *E. g.*, Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965).

7. *E. g.*, Oestereich v. Selective Service Bd., 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968); Wolff v. Selective Service Local Bd. No. 16, 372 F.2d 817, 825 (2nd Cir. 1967).

8. 3. During the period covered by the OER I was assigned to duty as Senior Advisor to the 2nd Brigade (BCT), 85th Division (TNG). Headquarters of the Brigade was located at 6400 Stratford Avenue, St. Louis, Mo. 63120. The Division Headquarters was located at Chicago, Ill. The Senior Advisor to the Division was Colonel Lloyd O. Pruett, USA, whose station was at Division Headquarters in Chicago. For administrative purposes I was assigned to the U. S. Army Advisor Group (USAR) which was located at 12th and Spruce, St. Louis, Mo. 63178. That Group was commanded by Colonel Arsene E. Bonifas, USA. (A chart indicating the various relevant positions and the individuals occupying them during the period mentioned above is attached as Inclosure 2.) Colonel Bonifas acted as the rating officer on the disputed OER. It is my belief that, for the reasons hereinafter appearing, under the provisions of the Regulation quoted above Colonel Pruett was the officer who should have performed the function of rating officer.

4. It is obvious that because my duty station was in St. Louis, and because my imme-

The issue presented lies squarely within the competence and statutory authority of the Army Board for Correction of Military Records (ABCMR). This Board, established pursuant to 10 U.S.C. § 1552 and 32 C.F.R. § 581.3 (1974)[9] is to consider all applications properly before it for the purpose of determining the existence of an error or an injustice," 32 C.F.R. § 581.3(b)(2) (1974), and may "correct any military record" when necessary to "correct an error or remove an injustice," 10 U.S.C. § 1552(a).[10] Its powers include the review and correction of passover discharges which have resulted from erroneous adverse OERs.[11]

---

diate superior, Colonel Pruett, was stationed in Chicago, it was assumed that Colonel Bonifas, also stationed in St. Louis, would have "the closest possible knowledge and observation" of my performance of my professional duties as Brigade Advisor. Actually, this was not so and quite the contrary was true.

5. Guidance with respect to matters pertaining to the activities of the 85th Division (TNG) and its subordinate units, including the 2nd Brigade (BCT), were received by me from the Senior Advisor, Colonel Pruett (Statement of Maj General William P. Levine, USAR, Inclosure 3; Statement of Lt. Colonel John R. Braue, USAR, Inclosure 9.) and reports on the status and progress of the training of the 2nd Brigade (BCT) were sent by me to Colonel Pruett. In other words, as would be expected, the flow of policy guidance, progress reports, and supervision of activities was basically vertical, from Division to Brigade and from Brigade to Division, and any flow between brigade and US Army Advisor Group (USAR) in St. Louis was minimal. (Statement of Jacob B. Krebsbach, SAA, GS–10, Inclosure 4.) Colonel Pruett visited the 2nd Brigade (BCT) frequently, both at home station drills and at active duty training, and he was thus in a position to form an opinion of my performance as Brigade Advisor "based on the closest possible knowledge and observation." (Statement of Colonel Lloyd O. Pruett, USA (Ret), Inclosure 5; Statement of Colonel J. W. Christy, USAR (Ret), Inclosure 6; Statement of Major John L. Politte, USAR, Inclosure 7; Krebsbach Statement, Incl. 4.) On the other hand, Colonel Bonifas, who was the rating officer on the OER, admittedly only observed my performance "infrequently." (Statement of Colonel Arsene P. Bonifas, USA (Ret), Inclosure 8.) Actually, "very rarely" would better describe Colonel Bonifas' opportunities to observe the performance of my duties as Brigade Advisor. (Christy Statement, Incl. 6; Politte Statement, Incl. 7; Krebsbach Statement, Incl. 4; Braue Statement, Incl. 9.)

9. The history of the Board and the need for its establishment are summarized in Williams, The Army Board for Correction of Military Records, 6 Military L.Rev. 41, 41–42 (1959) [hereinafter cited as Williams]:

The Army Board for Correction of Military Records (hereafter referred to as the ABCMR or the Board) was established, pursuant to Section 207 of the Legislative Reorganization Act of 1946, in a successful attempt by the Congress to free itself from the burdens of private relief legislation concerning military and naval records. Section 207 also established similar boards in the Air Force, the Coast Guard and the Navy. Prior to their establishment, upon the exhaustion of the administrative remedies available within a military department, an aggrieved individual was left to court action if the matter was justiciable (which it often was not) or to private relief legislation. * * *

\* \* \* \* \* \*

Since its establishment in 1947, the Board has received more than 18,000 applications for correction of individual military records. Approximately half of these have come from individuals who have received dishonorable or bad conduct discharges, and the balance have covered a wide variety of alleged errors or injustices, chief among which are eligibility for disability retirement. More than 2,000 changes of individuals' records have resulted from formal hearings by the Board, and over $2,500,000 has been paid as a result of such corrections. The ABCMR considers a range of cases as inclusive as the number of possible actions affecting Army personnel. [Footnotes omitted.]

See Glosser, supra note 3, at 392–96.

10. See generally, Glosser, supra note 3; Williams, supra note 9. For studies of the powers and procedures of review bodies generally, and examination of exhaustion requirements see Everett, Military Administrative Discharges—The Pendulum Swings, 1966 Duke L.J. 41; Lunding, Judicial Review of Military Administrative Discharges, 83 Yale L.J. 33 (1973); Meador, Judicial Determinations of Military Status, 72 Yale L.J. 1293 (1963); Sherman, Judicial Review of Military Determinations and the Exhaustion of Remedies Requirement, 55 Va.L.Rev. 483, 497–503, 520–25 (1969); Suter, Judicial Review of Military Administrative Decisions, 6 Houston L.Rev. 55 (1968).

11. Glosser, supra note 3, at 402–05; Affidavit of Raymond J. Williams, Executive Secretary of the ABCMR:

In my tenure as Executive Secretary, I have seen the ABCMR correct improper efficiency

Plaintiff characterizes an appeal to the ABCMR as futile, charging that the improbability of reversal by that body excuses application to it, since appeal would involve resort to "a nonexistence [sic] remedy." We do not share the plaintiff's pessimism. We will indulge, until otherwise convinced,[12] in the presumption that the military will be astute to afford to the plaintiff all of the rights and the protections afforded him by the Constitution, the statutes, and its own regulations.[13] It will not be forgotten, of course, that the Board's action is subject to judicial reversal if it is arbitrary, capricious, unsupported by substantial evidence or erroneous in law.[14] And, although the Secretary is authorized, in a proper case, to overrule the Board's recommendations,[15] he cannot do so arbitrarily, but must act on either explicitly stated policy reasons, or upon evidence presented in the record made to the Board.[16]

It is in situations of this type, involving challenge to the retention and promotion of personnel, that the exhaustion requirement finds peculiar applicability. A failure to exhaust the remedies available within the service itself will inevitably upset the balance, carefully struck, between military authority and the power of the federal courts. In the case before us we are in an area involving judgments as to military character, a field foreign to our normal competence. The application of the exhaustion doctrine [17] upon these facts allows the military an opportunity to exercise its own expertise, and to correct its own errors, all without subjecting the courts to inefficient employment of judicial resources through rulings upon matters yet interlocutory within the military system.[18]

Finally, plaintiff alleges a series of constitutional defects.[19] It is argued that there are no procedures for discovery before the Board, that there are no provisions for the compulsory attendance of witnesses, and that all members of the Board are appointed by the Secretary, it thus being, according to plaintiff, "absolutely inconceivable that [the Board] would declare one of his regulations unconstitutional." These flaws plaintiff asserts, deprive him of due process. Such matters, however, whether or not fatal within context, as to which we express no opinion, will never be reached should the plaintiff prevail before the Board.[20] We advert to the fundamental doctrine that the Court should avoid passing on unnecessary constitutional questions,[21] a doctrine pecu-

---

reports, resulting in payment of back pay, advancement in grade, and restoration to active duty status, as necessary to correct any injustice.

12. *E. g.,* Colson v. Bradley, 477 F.2d 639 (8th Cir. 1973) mandamus to process complaint in accordance with law and Army regulations.

13. *See* Hodges v. Callaway, 499 F.2d 417, 422–23 (5th Cir. 1974).

14. Sanford v. United States, 399 F.2d 693, 694 (9th Cir. 1968); Hoorwitz v. Resor, 329 F.Supp. 1050, 1051 (D.Conn.1970), aff'd per curiam, 445 F.2d 1407 (2nd Cir. 1971); Esgate v. United States, 186 Ct.Cl. 207 (1968), cert. denied, 395 U.S. 913, 89 S.Ct. 1759, 23 L.Ed.2d 226 (1969).

15. *See* 10 U.S.C. § 1552(a); 32 C.F.R. § 581.-3(f)(2) (1974).

16. Nelson v. Miller, 373 F.2d 474, 478 (3rd Cir.), cert. denied, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967); Weiss v. United States, 408 F.2d 416, 418, 187 Ct.Cl. 1 (1969); Hertzog v. United States, 167 Ct.Cl. 377, 384–85 (1964); Proper v. United States, 154 F.Supp. 317, 326, 139 Ct.Cl. 511 (1957).

17. See analysis in McKart v. United States, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

18. Mindes v. Seaman, 453 F.2d 197, 201–02 (5th Cir. 1971); *see* Pickell v. Reed, 446 F.2d 898 (9th Cir.), cert. denied, 404 U.S. 946, 92 S.Ct. 301, 30 L.Ed.2d 262 (1971); McCurdy v. Zuckert, 359 F.2d 491 (5th Cir.), cert. denied, 385 U.S. 903, 87 S.Ct. 212, 17 L.Ed.2d 133 (1966).

19. See analysis of constitutional claims within traditional military area in Mindes v. Seaman, 453 F.2d 197, 201 (5th Cir. 1971).

20. *Cf.* Beard v. Stahr, 370 U.S. 41, 82 S.Ct. 1105, 8 L.Ed.2d 321 (1962); Sohm v. Fowler, 124 U.S.App.D.C. 382, 365 F.2d 915, 918 (D.C. Cir.1966).

21. Pub. Util. Comm'n v. United States, 355 U.S. 534, 539–40, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); 3 K. Davis, Administrative Law Treatise § 20.04 (1958).

liarly applicable here in view of our traditional reluctance to interfere with the military establishment.

Upon a careful review of the entire record we find no procedural or other error in the case and, in the light of the foregoing, we affirm for failure to exhaust administrative remedies.