**Ralph C. VANCE, Plaintiff,**

v.

**The UNITED STATES of America, Thomas C. Reed, Secretary, United States Air Force, Cecil Fox, Commanding General, Sheppard Air Force Base, Defendants.**

**Civ. A. No. CA–7–76–23.**

United States District Court,
N. D. Texas,
Wichita Falls Division.

May 26, 1977.

---

1. Also, this was objected to at the time of the hearing before the Administrative Law Judge.

Milton E. Douglass, Wichita Falls, Tex., for plaintiff.

Richard J. Vance, Asst. U. S. Atty., Fort Worth, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT M. HILL, District Judge.

The motion of the plaintiff, Ralph C. Vance, for summary judgment and the motion of the defendants to dismiss or alternatively, for summary judgment, came on for consideration before the Honorable Robert M. Hill, United States District Judge. The court has considered the motions, the arguments and briefs of counsel, and is of the opinion that the defendants' motion for summary judgment should be granted and the plaintiff's motion should be denied.

Vance seeks restoration to the rank and privileges of master sergeant in the Air Force, a declaratory judgment that Air Force Regulation 50–49 is unconstitutional, and monetary damages resulting from his demotion pursuant to this regulation.[1] He alleges that application of this regulation to him violates the guarantee of equal protection implicit in the Fifth Amendment in that overweight officers may be discharged or demoted only if their obesity adversely affects the performance of their duties while overweight enlisted men may be similarly disciplined without reference to job performance.

The Air Force argues that this suit should be dismissed because the regulations in question are not subject to judicial review and also because Vance has failed to exhaust an administrative remedy—appeal to the Air Force Board for the Correction of Military Records (hereinafter AFBCMR).[2] The issue of non-reviewability is inextricably bound up with the merits of a constitutional claim,[3] unlike exhaustion, which the court must consider as a threshold matter.

### 1. Exhaustion

■ At least one district court, after examining at length the mechanics of military corrections boards (hereinafter BCMR), recently suggested that the doctrine of exhaustion should seldom if ever require appeal to such boards since this procedure is totally useless. *Rew v. Ward,* 402 F.Supp. 331 (D.N.M.1975). Although such a prerequisite to filing a suit does limit judicial interference in military matters—the aggrieved may more quickly tire of and abandon litigation while exhausting his remedies, or, on rare occasion, may be afforded relief—this procedure does nothing to develop facts for judicial review.[4] The looseness of BCMR procedures is explained in no small part by its origin: an attempt by Congress to rid itself of private relief legislation for non-justiciable controversies. *See Horn v. Schlesinger,* 514 F.2d 549, 552 n. 9 (8th Cir. 1975). Nevertheless, the Fifth Circuit has held that a serviceman must ordinarily exhaust his remedies before military corrections boards. *Hodges v. Callaway,* 499 F.2d 417, 422 (5th Cir. 1974).

■ The rule of exhaustion is not inflexible. Some cases reason that "because the BCMR's have no legal expertise, resort to them for purely legal claims of error should not be required."[5] The Fifth Circuit has indicated that it agrees with this rationale to some extent, although designation of a claim as "legal" is not in itself a touchstone. See *Hodges,* 499 F.2d at 421 n. 9, 422. *Hodges* involved an arguably "legal" claim: that the Army had failed to follow its own regulations in discharging the plaintiff and that the procedures employed violated due process. But the Fifth Circuit squarely held that the Army should be allowed every

---

1. Jurisdiction in this court is based on 28 U.S.C. § 1346. The plaintiff seeks damages not to exceed $10,000 and incidental equitable relief authorized under the Tucker Act.

2. Vance did apply for review before the AFBCMR after the instigation of this suit. That review is still pending.

3. *See, e. g., Mindes v. Seaman,* 453 F.2d 197, 201 (5th Cir. 1971).

4. When the AFBCMR (or its examiners) denies a hearing to an applicant, it does so without any findings or basis for its decision. In 1974, the AFBCMR granted a hearing in five or six out of 4800 applications. *Rew v. Ward,* 402 F.Supp. 331, 335–6.

5. Lunding, Judicial Review of Military Administrative Discharges, 83 Yale L.J. 33, 70 (1973), citing *United States ex rel. Brooks v. Clifford,* 412 F.2d 1137 (4th Cir. 1969), and cases following it.

832 of the present

opportunity to interpret and apply its own regulations. Exhaustion was required. *Accord, Mindes v. Seaman,* 453 F.2d 197 (5th Cir. 1971).

Other circuits seem in general agreement on these mixed questions of fact and law. *E. g., Bard v. Seamans,* 507 F.2d 765 (10th Cir. 1974); *Horn v. Schlesinger,* 514 F.2d 549 (8th Cir. 1975). All of these cases involve similar situations: the plaintiff alleges cumulative unfairness in that his discharge was based on incorrect facts and was effected in violation of armed forces regulations and the United States Constitution. Although questions of due process are indirectly implicated, the courts have consistently required such suitors to first exhaust their remedies before the BCMRs.

The instant case, by contrast, presents a legal question "purer" than the more mundane due process claims discussed *supra.* Vance and the Air Force have stipulated to all the pertinent facts and regulations. After unsuccessfully participating in the Air Force weight control program, administrative action was commenced against Vance, resulting in his demotion. Air Force Manual 39–10 and Air Force Regulation 39–30 prescribe separation and demotion, respectively, as sanctions for the failure of an enlisted man to maintain the weight standards provided in Air Force Regulation 50–49. AFR 39–30 para. 4(a)(5), pursuant to which Vance was demoted, states that demotion may be based on failure to control one's weight after being placed in a remedial weight program. This regulation makes no reference to the enlisted man's perform-

ance of his duties, and the parties agree that this consideration is irrelevant. By contrast, an officer, at the time in question (September 20, 1974), could not be demoted under Air Force Regulation 36–3 para. 4 unless his performance of duty was substandard.[6]

■ In summary, the facts of this case are not disputed; the parties agree about the legal effect of the regulations in question; and the effect of these regulations is apparent on their face as well as supported by official Air Force communications. Therefore, the court concludes that Vance's equal protection attack on Air Force weight regulations presents a "purely legal" claim over which the AFRCMR possesses no particular expertise. See *Hodges v. Callaway,* 499 F.2d at 422 n. 14. Exhaustion is therefore not required.

### 2. *Reviewability*

■ Although it is often said that matters within military discretion are not reviewable by the courts, this formulation is of little use in determining general principles for judicial review of constitutional challenges to military actions. For example, in *Cortright v. Resor,* 447 F.2d 245 (2d Cir. 1971), a leading case in which the plaintiff challenged a transfer by the army as infringing his First Amendment rights, Judge Friendly could at the same time caution that "judges are not given the task of running the Army" and reject court interference in internal military affairs yet leave the door open for judicial interference if a plaintiff could make "a stronger case." 447

---

**6.** A communication from the Department of Air Force dated May 7, 1975, (Attachment E to Plaintiff's Original Complaint) states:

1. Recent Secretarial decisions have retained on active duty officers who (sic) commanders sought to separate under AFR 36–3 (Substandard Performance of Duty) for failure to attain/maintain established weight standards. The reason for these decisions was lack of sufficient documentation to satisfactorily establish that substandard performance of duty did, in fact, result from the officer's failure to adhere to the weight standard.

2. The guidance was clear—we must improve documentation of our cases . . .

Documentation must clearly establish both failure to attain/maintain the standard and those aspects of substandard performance of duty which result from this failure.

AFR 36–3 para. 4 has since been amended to provide that "failure to conform to prescribed standards of dress, personal appearance, or military deportment" may constitute substandard performance of duty. See Attachment to Defendant's Reply in Opposition to Plaintiff's Motion for Summary Judgment (September 2, 1976). Thus, there presently appears to be no difference in the application of weight standards to officers and enlisted men.

F.2d at 245. Most contemporary case law exhibits the same tendency to pay lip service to the idea of a non-reviewable zone of military discretion while simultaneously analyzing the constitutional claim on its merits. *E. g., Anderson v. Laird,* 437 F.2d 912 (7th Cir. 1971); *Dash v. Commanding General, Fort Jackson, South Carolina,* 307 F.Supp. 849 (D.S.C.1969).

For this reason, the court is not overly impressed with the Air Force's attempt to drape itself in bunting and dust off *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1955). The desire of the judiciary to avoid entanglement in military administration is strong, but no court today can avoid reasoned analysis of a serious constitutional claim under the catchphrase that judges do not run the army.

Rather than summarily consign a particular complaint to the realm of internal military affairs, a court must balance the special needs of the military against the constitutional rights of the individual, keeping always in mind that constitutional claims are themselves unequal in the whole scale of values. *Mindes v. Seaman,* 453 F.2d 197 (5th Cir. 1971). For example, due process challenges to administrative personnel actions as constitutionally arbitrary and capricious generally have little merit. The legal interest or entitlement of an individual member of the armed forces in avoiding a transfer or a call to active duty is generally negligible, and the need of the military to promote one officer over another or call up one reserve member rather than another is generally not a determination that courts are able to make and in which they must defer to the judgment of the military.[7] *E. g., Roth v. Laird,* 446 F.2d 855 (2d Cir. 1971) (court would not review denial of hardship exemption to a doctor in the reserves). By

contrast, however, a claim that the military is violating equal protection rights generally requires close analysis and evaluation of the personal and institutional interests involved:

The Court could not stay its hand if, for example, it was shown that only blacks were assigned to combat positions while whites were given safe jobs in the sanctuary of rear echelons.

*Mindes v. Seaman,* 453 F.2d at 199.

### 3. Equal Protection: An Overview

Vance's equal protection attack on AFR 50–49 may be framed in two different ways. Vance's brief and oral argument suggest to the court that he is probably challenging this administrative regulation as a classification based on weight. His brief argues that the air force might more rationally achieve its goals of military preparedness by a narrower regulation based on weight only in so far as it affects duty performance. He points to the regulations then (but no longer) applicable to commissioned officers as proof that a narrower regulation would be feasible. It is also possible, however, that Vance attacks the different treatment accorded commissioned officers and enlisted men who are similarly situated on the scale. This line of argument constitutes an attack on military caste in itself as a permissible classification for different personnel policies. Since the court is uncertain about which of these two theories Vance relies upon, it will consider both.

Under either theory, the standard of analysis initially chosen by the court will largely determine the result. A court would be most unlikely to show any deference to military needs in the case of strict scrutiny of a suspect classification[8] under

7. While such personnel decisions are difficult to review on the grounds of being arbitrary and capricious, since such actions often rest on a completely ad hoc evaluation of the military's institutional interests and the interests of the individual serviceman, there is no question that these decisions are reviewable when military officials have violated their own regulations. *Mindes v. Seaman,*453 F.2d at 200.

8. Vance has not alleged the invasion of any fundamental right which would require the same strict scrutiny applied to suspect classifications. To the extent that the plaintiff cites *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and argues that his continued expectation of employment is a fundamental right, he errs by confusing funda-

equal protection analysis. Traditional suspect classifications—e. g., race, national origin, alienage—are innately distasteful, and a legitimate military interest in using a suspect classification is difficult to imagine.

■ If the "substantial relation" test of *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971)[9] is applicable, the court would necessarily look to an actual, empirical relationship between the classification and the administrative objective, rather than indulging any fanciful justification offered by the military. But the burden would be on the challenger to disprove any substantial relation, *Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651, 664 (1976). Also, in the opinion of the court, the status of the military as a specialized society would require some greater latitude for the underinclusiveness or overinclusiveness of a classification, assuming that a relationship between the classification and a legitimate military goal was otherwise established. If the policy of noninterference in military affairs has any meaning, equal protection under the substantial relation test must tolerate some greater imperfection in military classifications than would be allowed under similar circumstances in civilian life. Such tolerance is of course not without limits.

■ Finally, under the traditional rational relation test, one who challenges a military regulation would carry an extremely heavy burden of proving the classification in question patently arbitrary and unrelated to any conceivably legitimate military purpose. This standard is tempting because of the threat to military administrative integrity by allowing routine challenges in court to military practices alleged to be arbitrary, irrational, or unwise to some extent. Under this standard a court would allow military practices a presumption of validity at least as indulgent as the standard of review traditionally accorded to economic and tax legislation.[10] In other words, hands off.

mental rights under equal protection analysis with property interests protected by due process.

A recent Supreme Court decision has again pointed up this distinction:

This Court's decisions give no support to the proposition that a right of governmental employment per se is fundamental. . . . Accordingly, we have expressly stated that a standard less than strict scrutiny "has consistently been applied to state legislation restricting the availability of employment opportunities."

*Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520, 524–525 (1976).

9. A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). 404 U.S. at 76, 92 S.Ct. at 254, 30 L.Ed.2d at 229. The hallmark of the "substantial relation" test is its empirical focus: the classification must in fact advance the objective of statute. *See, e. g., Cleveland Board of Education v. La Fleur,* 414 U.S. 632, 653, 94 S.Ct. 791, 39 L.Ed.2d 52 (Powell, J., concurring); *Schlesinger v. Ballard,* 419 U.S. 498, 508, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975). A substantial relation means that the classification may not be unduly underinclusive or overinclusive with respect to the statutory or administrative objectives. Considerations of equity and public policy are frankly considered: the unfairness of differentiating people on the basis of their sex, *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397, 407–8 (1976); or their legitimacy, *Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651, 660–661; the importance of zoning to the quality of life, *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); etc. The importance of letting the military regulate its own affairs and make its own judgments about military necessities should also present an important consideration under this test. *But see Robinson v. Rand,* 340 F.Supp. 37 (D.Colo. 1972); *Crawford v. Cushman,* 531 F.2d 1114 (2d Cir. 1976) (the court applied overinclusive/underinclusive analysis to a mandatory pregnancy discharge regulation of the Marine Corps, rigorously comparing it to similar regulations held invalid as to public school teachers).

10. When taxation or regulation of economic activity is all that is involved, a state has wide discretion in assessing the problems to be dealt with and in deciding what classifications are reasonable. Unless it is "palpably arbitrary," a classification is likely to be upheld, and if any state of facts which would sustain the classification's rationality can reasonably be conceived, its existence must be assumed.

Developments in the Law; Equal Protection, 82 Harv.L.Rev. 1065, 1083 (1969).

The foregoing exposition of the court's ideas about the pertinent standards for equal protection challenges to military regulations is rooted in the concept advanced by *Mindes v. Seaman* that not all constitutional claims are of equal value. It is the court's view that not all equal protection claims are of equal value, and the deference by the court to military judgment about legitimate ends and the use of classifications as necessary or merely convenient means, should vary sharply with the standard of equal protection analysis chosen.

### 4. *Strict Scrutiny Inappropriate*

The regulation in the instant case clearly does not warrant strict scrutiny by the court, regardless of how Vance frames his equal protection complaint. Neither weight nor military caste is a suspect classification. Fat people and enlisted men are not in the words if *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." 411 U.S. at 28, 93 S.Ct. at 1294.

The vulgar tendency to bait a fat man seems a timeless characteristic of human society, but there is no indication that obesity has ever served as a badge of social or political disenfranchisement. If the historians, satirists, and polemicists of past ages are credible witnesses, overweight people have always enjoyed a disproportionate share of power and wealth. The court therefore does not regard weight as a criterion requiring the extraordinary protection of strict scrutiny.

The disparity of treatment accorded enlisted men and commissioned officers is doubtless real and ubiquitous in military society. But hierarchical rank is an intrinsic characteristic of military organization and does not offend the egalitarian ideals underlying the Fourteenth and Fifth Amendments. Moreover, unlike the suspect classifications of race, alienage and national origin (or even classifications such as sex, wealth, and legitimacy, which, although not "suspect," are entitled to a high degree of judicial scrutiny), the status of an officer or enlisted man is voluntarily assumed, conscription aside. While the court is not of the opinion that a man surrenders all human and civil rights when he enlists in the air force, it must nevertheless note that any political or economic disabilities associated with the status of an enlisted man may be resigned at the end of a fixed term, never exceeding six years. 10 U.S.C.A. § 505(c) (1975). Consequently, the court also rejects the exacting judicial scrutiny applied to traditional suspect classifications as an inappropriate test for distinctions based on military caste.

### 5. *The Substantial Relation Test Applied to Physical Traits*

Although strict scrutiny is easily eliminated because of the demanding and distinct nature of suspect classifications (Vance has not alleged the invasion of a fundamental interest), a choice between the "old" equal protection analysis and the newly invigorated "substantial relation" test is problematical. *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975), which applied the substantial relation test to uphold a sex-based classification vis-a-vis different promotion plans in the Navy, did not articulate an evaluative litmus test for military classifications.

In the opinion of the court, the substantial relation test provides an appropriate standard of review for classifications based on physical characteristics. Some minimal measure of protection (more than a hands off stance) is due since physical characteristics such as height, weight, strength, endurance, etc., may be interrelated to some extent with sex and lineage. Many physical traits are genetically determined, although this is probably less true of weight. Distinctions based on physical traits are logically nonegalitarian but do not necessarily offend our egalitarian political ideals if such classifications substantially further a legitimate governmental goal.

In the case of military classifications based on physical traits, a court is capable of judging on a gross level whether the classification substantially furthers a legitimate military goal, i. e., whether the justification is real or fantastic, for courtroom consumption only. Since the business of the armed forces is fighting wars, most physical requirements will relate directly or indirectly to military fitness and preparedness for combat. There is no question, for example, that weight regulations are in fact substantially related to a legitimate military concern—physical fitness. This aspect of the "substantial relation" test is satisfied.

Vance has argued basically that the weight classification, although in fact related to a legitimate goal, is overinclusive: it penalizes some persons who are overweight but are nonetheless fit or who, if not fit, may still perform their duties in an outstanding manner since they are desk jockeys, not combat soldiers. *See* Plaintiff's brief at 21. This argument could without any hyperbole apply with equal force to Air Force regulations discriminating against those suffering from poor eyesight, emotional disabilities, or paraplegia. There are surely jobs in the armed forces which persons with these disabilities could perform in an outstanding manner.

In the opinion of the court, the Air Force might possibly have drawn narrower weight regulations which would accomplish the same goals,[11] but equal protection does not require it do so. The interest of the armed forces in the mobility and uniformity of their personnel makes reasonable under equal protection analysis the uniform application of minimum physical standards which may not be necessary for every given job. The need to maintain physical fitness is peculiar to the military in a way different from any other government agency, and the court will not substitute its judgment for the Air Force's about the feasibility of less restrictive weight regulations.

A proper concern for military administrative integrity requires forebearance from the procrustean overinclusive/underinclusive analysis of which courts are capable. If AFR 160–1 provides that a serviceman six feet tall and twenty-eight years old cannot exceed 205 pounds, the court need not hear testimony from a physiologist that 215 pounds would be more appropriate, or that a soldier weighing 205 pounds and with some minor degree of astigmatism is as combat-effective as another soldier weighing 215 pounds with perfect eyesight. In the case of weight regulations, the goal is legitimate and the relationship is real. Military classifications based on physical traits require no more under equal protection.

A recent analogous Supreme Court case involved a Massachusetts statute mandating retirement of state police officers at age 50. The Court rejected the plaintiff's attack on the state's ability to draw broad lines substantially furthering a legitimate state interest:

> In this case, the Massachusetts statute clearly meets the requirements of the Equal Protection Clause, for the State's classification rationally furthers the purpose identified by the State. Through mandatory retirement at age 50, the legislature seeks to protect the public by assuring physical preparedness of its uniformed police. Since physical ability generally declines with age, mandatory retirement at 50 serves to remove from police service those whose fitness for uniformed work presumptively has diminished with age. This clearly is rationally related to the State's objective. There is

---

11. It is noteworthy that the Air Force found the less restrictive alternative based on duty performance alone inadequate for its purposes. It first made a concerted effort to remove overweight officers under the duty performance standard; it then changed its regulation for officers to provide in essence that being overweight constituted by definition inadequate performance of duty. *See* note 6, *supra.* Thus,

the plaintiff has not, in the court's opinion, carried its burden to show its less restrictive suggestion is feasible for Air Force purposes. One very plausible purpose which Vance has not addressed is the Air Force interest in morale which enforcement of weight standards might serve, particularly as applied to officers, commissioned or non-commissioned.

no indication that § 26(3)(a) has the effect of excluding from service so few officers who are in fact unqualified as to render age 50 a criterion wholly unrelated to the objective of the statute.

That the State chooses not to determine fitness more precisely through individualized testing after age 50 is not to say that the objective of assuring physical fitness is not rationally furthered by a maximum-age limitation. It is only to say that with regard to the interest of all concerned, the State perhaps has not chosen the best means to accomplish this purpose.

*Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314–316, 96 S.Ct. 2562, 2567–2568, 49 L.Ed.2d 520, 525–6 (1976). (footnotes omitted).

Although the Court in *Murgia* couches its opinion in terms of the "rational basis" test, and Justice Marshall, dissenting, accuses the Court of applying "the same minimal standards of rationality that we use to test economic legislation," 427 U.S. at 321, 96 S.Ct. at 2571, 49 L.Ed.2d at 530, a close reading of the case suggests that it is requiring more than minimal reationality in the area of employment rights tied to physical traits. Even the dissent agreed that the objective of the statute—a fit police force—was real and compelling, not some tenuous judge-made rationalization. 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d at 532. Furthermore the majority examined evidence which showed a substantial relation between the classification and the objective: a large portion of men over 50 were in fact unable to adequately perform the job. 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d at 526 n. 7. The general relationship between age and physical stamina is a matter of common knowledge, as is the relationship between weight and fitness.

■ The actual point of disagreement in *Murgia* was the broad and somewhat indiscriminate mechanism of forced retirement at a fixed age. One can assume that some policemen over the age of 50 could do the job, just as some soldiers over the weight limits in question can doubtless perform their tasks with distinction. The question is what degree of particularization does equal protection require in the application of job-related physical requirements. *Murgia* answers that in the case of specialized societies such as police—and by strong analogy the armed forces—the physical criteria may be broad and relatively unparticularized.

### 7. *Military Caste and Minimal Scrutiny*

The court must finally consider whether equal protection analysis (under some standard less than strict scrutiny) invalidates the weight regulations in question in so far as they provided slightly different implementation procedures against overweight officers and overweight enlisted men—a classification based on military caste. It is pointless to inquire after a "purpose" for this differentiation, as if the Air Force consciously made a distinction between overweight officers and enlisted men to further some goal in regard to weight. The subsequent Air Force manipulation of the regulations on performance of duty by officers indicates its desire to make weight in itself constitute grounds for separation or demotion of officers, just as with enlisted men. *See* note 6, *supra.*

The disparities in AFR 36–3 para. 4 and AFR 39–30 para. 4(a)(5) arise from the existence of a statute tying separation of commissioned officers to their performance of duty. 10 U.S.C. § 8781. No corresponding statute governs separation of enlisted men.[12] Thus, this difference in weight regulations does not in itself further any military purpose but is an outgrowth of broader personnel policies differentiating enlisted men and officers. The court must inquire whether officers and enlisted men are similarly situated such that the Air Force must coordinate all aspects of its policies with respect to each group.

---

12. 10 U.S.C. § 1169 provides:

No regular enlisted member of an armed force may be discharged before his term of service expires, except—(1) as prescribed by the Secretary concerned  .  .  .

One cannot ask if enlisted men and officers are similarly situated without referencing the question. With respect to what [13] are they similarly situated—procedural rights at a court martial, post-discharge or retirement benefits, amenities of life in the service, etc.? This inquiry is intimately related to the different standards of equal protection analysis. One line of strict scrutiny, for example, embodies that strong presumption that all men are similarly situated with respect to enjoyment of certain fundamental rights. *E. g., Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). Minimal rationality, at the other extreme, implies that the criterion of similarity or dissimilarity may rest on any legislative determination of governmental interest within the traditional bounds of governmental powers. *E. g., Royster Guano Co. v. Virginia,* 253 U.S. 412, 418, 40 S.Ct. 560, 64 L.Ed. 989 (Brandeis, J., dissenting).[14]

■■■ In the opinion of the court, administrative convenience falls well within the traditional bounds of government interests. It may excuse the imposition of somewhat different job-related requirements on the employees of different administrative divisions, even if the incremental difference in the respective requirements serves no particular function.[15] In other words, the court does not view officers and enlisted men as similarly situated with respect to

performance of duty requirements in light of the government's administrative interest in imposing non-uniform job requirements on employees of different classes. This conclusion obviously entails minimal scrutiny under equal protection analysis, but use of this lax standard is justified by the necessity of allowing any employer, even the government, some latitude in decentralizing administration of its far-flung bureaucracy.

Since the court has reasoned that an administrative line may in itself justify different treatment based thereon, it must, to avoid circularity, inquire whether the administrative difference is the source of the different treatment and not the result of it. In the instant case, the difference in AFR 36–3 and AFR 39–30 arise from pre-existing personnel classifications of long historical standing and considerable scope. In addition to the differences in military prestige and privileges, the career progressions of the two groups are markedly different under current statutes in that enlisted men may routinely reenlist for fixed terms, 10 U.S.C.A. § 508 (1975), while officers are subject to an up-or-out policy. 10 U.S.C.A. § 8303 (Supp.1976).

■■■ In view of the fact that officers and enlisted men are organized and treated as two different groups of employees with respect to entry and discharge from the armed forces, the administrative conve-

---

13. In its purely formal aspect the principle of equality as applied to the treatment to be accorded men requires merely that similar cases be treated similarly, "according to one and the same rule."

  *   *   *   *   *   *

The problem with this concept as a guide to action is that it operates only on the assumption that persons and situations have already been determined to be relevantly similar; it does not itself provide a criteria of relevance. Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1163–64 (1969).

14. With respect to the fiscal interests of the State of Virginia, businesses incorporated within and without the state were not similarly situated. The state might therefore distinguish between the two groups in giving a tax advantage to the latter. This is, of course, only another way of stating that the classification rationally furthered a state interest.

15. *Compare Chamberlain v. Wichita Falls I.S.D.,* 539 F.2d 566 (5th Cir. 1976), in which the court upheld an extra measure of procedural protection accorded to probationary teachers, as contrasted to "continuing contract teachers." The differentiation of employees in this case furthered a rational state policy of protecting the less secure probationary teachers. In the instant case, the Air Force has not advanced a purpose for its policy of tying discharge and reduction in rank of officers to performance of duties while allowing a broader standard of discipline for enlisted men. There may well be such a purpose, but since the court can only speculate on the reason, it must approach the distinction from the perspective of whether the administrative difference is its own justification.

 

nience to the Air Force of adapting weight policies to the prexisting statutes and regulations applying to both groups is in itself sufficient reason to view them as not similarly situated.[16]

■ Another reason for taking a hands-off, minimal scrutiny stance toward equal protection analysis of job requirements is the augean yet trivial labor which courts would undertake if they allowed any federal employee to compare his job requirements with those of any other federal employee, attacking those de minimis differences which doubtless pervade our immense bureaucracy and making the government conjure up explanations for any dissimilarities. Equal protection should not require uniform regulations for the job requirements of all employees of every department of the federal government except to the extent that the government can justify discrepancies.

■ The final consideration in the choice of an equal protection standard is a valuation of the employee's interest in equal treatment which cuts across any administrative lines and imposes the same job requirements and penalties for failure to maintain job standards on all government workers. While the court does not entirely discount this interest, it does minimize it with respect to differing job-related demands made on officers and enlisted men, when the demands satisfy due process[17] and involve no stigma or injury to any employee's reputation.[18]

■ In conclusion, the court does not view the interests involved under these facts as requiring more than minimal scrutiny of differences in job requirements based on administrative lines. The fact that officers and enlisted men fall under separate administrative schemes and are consequently governed by somewhat different weight policies does not, in the judgment of the court, offend equal protection.

It is ORDERED that the defendants' motion for summary judgment is granted and the plaintiff's motion for summary judgment is denied.

---

16. This reasoning applies a fortiori to any suggestion by Vance that Air Force weight regulations may violate equal protection because they are more stringent than the weight regulations of other branches of the armed forces. The governmental interest in maintaining separate administration of these branches is a sufficient criterion by which to conclude that the personnel of each branch is not similarly situated with respect to demands made on them in relation to their performance of duties. *Cf. Ives v. Franke,* 106 U.S.App.D.C. 203, 271 F.2d 469 (1959).

17. This legal challenge does not implicate either procedural or substantive due process. There is no question that the treatment accorded Vance, viewed in isolation, was fundamentally fair.

18. If there were any stigma attached to Vance's loss of his job, his interest in the same treatment as officers or other federal employees might arguably be greater. His loss, however, is solely monetary.